[No. S004615. Crim. No. 23750. Dec. 18, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL ANTHONY JACKSON, Defendant and Appellant.

**COUNSEL**

Gerald H. Gottlieb, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White and Richard B. Iglehart, Chief Assistant Attorneys General, Edward T. Fogel, Jr., Assistant Attorney General, Gary R. Hahn, John R. Gorey and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**PANELLI, J.**—Michael Anthony Jackson appeals from a judgment of death imposed for the first degree murder of Kenneth Wrede on August 31,

1983. (Pen. Code, § 187.)[1] The jury found true the special circumstance allegation that Wrede was a peace officer who was intentionally killed while engaged in the performance of his duties and that defendant knew or reasonably should have known that Wrede was a peace officer in the performance of his duties. (§ 190.2, subd. (a)(7).) The jury also found that defendant personally used a firearm within the meaning of sections 12022.5 and 1203.06, subdivision (a)(1). We affirm the judgment in its entirety.

### GUILT PHASE FACTS

There is little dispute as to what happened in the confrontation that resulted in defendant's shooting of Officer Wrede. Prosecution and defense witnesses testified to a substantially similar sequence of events. Responding to two citizen calls that a man was acting strangely in a residential neighborhood, Wrede approached defendant who was barefoot and disheveled and stumbling aimlessly. The officer asked defendant to identify himself and state where he was going; defendant pointed in a northerly direction. Officer Wrede asked defendant to sit on the curb. Defendant ignored Wrede and walked away. When Wrede followed, defendant turned on the officer and a fight ensued. Defendant seemed to overpower the officer, tearing his uniform, pulling off his badge and throwing him around. The officer attempted to fend off defendant's blows, blocking them with his baton, and attempted to use mace, which barely deterred defendant. On his part, defendant tried to pull a sapling from the ground to hurl at Wrede and then did pull up the supporting stakes (six and nine feet long), swung them, and threw them at the officer. Defendant then grabbed the officer by the waist and dragged him to the ground, causing him to lose the baton. The officer struggled free, ran to the driver's side of the police car, and reached for the radio. At this point the officer had not drawn his service revolver. At the same time defendant ran to the passenger side of the car, opened the door, and reached for the shotgun located in a rack at the front of the patrol car. Defendant pulled the gun *and the rack* from the car and tried, unsuccessfully, to cock it by pulling the chamber back.[2] Wrede drew his revolver. The two pointed the guns at each other over the top of the car as defendant stood on the curb, leaning on the car, and the officer crouched on the other side of the car. Defendant pulled the trigger, but the gun failed to fire because the shotgun was not cocked. Defendant removed the shotgun from the top of the patrol car, successfully cocked it and again pointed the gun at the officer who was now crouched near the driver's door by the lightbar. However, when the

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

[2] The shotgun holds four rounds which are placed in a magazine tube on the side of the weapon. In order for a round to get from the magazine tube into the firing chamber it is necessary to push the slide handle all the way to the rear and then all the way forward. The shotgun can then be fired as long as the safety is off.

officer told him to put the gun down, defendant appeared to comply. Defendant laid the shotgun down on the roof by the lightbar and put his head and left hand on the roof; he kept his right hand on the shotgun. As Officer Wrede moved to the rear of the car to come around, defendant aimed at and shot the officer.

Responding police units, including a K-9 unit, arrived seconds thereafter. Defendant walked away from Wrede's patrol car towards two of the responding officers, attempting to cock the shotgun while making statements that "I'll shoot you . . . I'm gonna shoot you . . . I'm gonna kill all the fucking pigs." Deputy Sheriff Vine testified that he watched defendant coming toward him, holding the gun and attempting to activate the slide of the shotgun to chamber a round. Vine drew his gun and pointed it at defendant but he did not fire because an officer, with the police dog, was directly behind defendant. Instead, Vine yelled, "Release your dog, do something" and "Shoot him, shoot him."

The dog was unleashed to attack defendant. Defendant hit the attacking dog with the shotgun. Though stunned, the dog eventually succeeded in biting defendant, causing him to drop the shotgun. Police converged and, after a fierce struggle, three officers finally subdued defendant. During the struggle, defendant not only attempted to retrieve the shotgun but also attempted to take a holstered gun from one of the officers.

Testifying in his own behalf, defendant stated that on the morning of August 31st he did some work at the home of a friend, James Butler. As partial payment of money owed, Butler offered him a half stick of a "super cool," a cigarette dipped in phencyclidine (PCP). Later in the morning, defendant shared two or three "super cools" with Butler and two women friends. As he did so, it "just all of a sudden creeped up on me and just explode." According to defendant, the last thing he remembered was passing around the third "super cool" with the others. He did not remember leaving Butler's house, kicking off his beachwalkers, or running down the street. The next thing he remembered he was somewhere "with a bunch of lights in his face and hearing someone saying he was a hero." Defendant did not remember anything after that until he was pinched by someone when he came to in a hospital. At that time, he jumped up. He did not recall whether he was strapped down.

Thereafter, defendant "just knocked out" and woke up in a bed in a one-person cell. Two officers came to talk to him but he did not recall whether they advised him of his constitutional rights. One of the officers said, "Do you know what you are in for?" When defendant stated "no," one officer told him he had shot a police officer with a gun. The other officer said,

"With his shotgun." Defendant told the officers, "No, it wasn't me, you got the wrong man. The other man is out. You letting the criminal get away." The officers left, indicating they would return.

Before the officers returned, however, defendant was visited by an attorney who advised defendant not to talk to anyone. Defendant gave the attorney's card to the doctor or nurse and did not see the officers again.

Defendant claimed he had no memory of the events involving the shooting of Officer Wrede. He acknowledged that he was a chronic user of PCP, having used it since 1977. In the summer of 1983 he used PCP three or four times a week; he had been arrested and convicted of using or being under the influence of PCP five or six times; he also admitted a 1975 conviction for second degree burglary.

Defendant called several witnesses whose account of the shooting incident was substantially similar to that of the prosecution witnesses. Defense counsel directed his questioning of them principally to defendant's bizarre behavior before Officer Wrede arrived, to defendant's angry and vulgar response to the officer, and to the almost Herculean proportions of defendant's physical response.

Other defense witnesses testified to defendant's condition immediately after the shooting, his low blood pressure (90 over 40) and the difficulty of establishing an intravenous connection because of his uncooperative behavior and "thrashing around." Defendant was "sweaty" and appeared to be under the influence of an unknown substance.

The emergency room physician, Dr. Rosebrough, testified that defendant was "in a lesser state of consciousness." His rapid heart beat and low blood pressure were consistent with dehydration, and he could have been in a state of shock. Defendant's urine screen was positive for amphetamines and cocaine, and his blood screen was positive for PCP. Defendant became verbally responsive about an hour and a half after receiving intravenous fluids.

Registered nurse Gerald Osacho testified that defendant's arms and legs were restrained because he was a suspected user of PCP, that he appeared to be in a "shock like" state but not in "true shock." At about 3 p.m. he made his first lucid response, stating his name and indicating that he took PCP. A police officer then asked defendant for some identifying information. As he left the hospital at 4 p.m., possibly in response to a police officer's question—"[d]o you know why you are here?"—defendant asked, "Why am I under arrest. Are you charging me with killing a cop?"

Dr. Orm Aniline, a psychiatrist, testified that the effects of PCP are unpredictable and vary with the individual. A chronic user, because of PCP stored in his system, may be "set off" with a slight amount of PCP as compared to a first-time user. Although a first-time user would be unconscious with about 100 nanograms per milliliter of PCP in the blood, there is no way to determine what amount of nanograms per milliliter of PCP in the blood would render a chronic user unconscious. There is no agreed upon intoxication level of PCP which indicates when a person is under the influence of PCP or which will predictably result in distorted behavior. Some PCP intoxicated persons behave normally, while some users may "overreact" and engage in "bizarre behavior" in what are perceived as stressful events or acts of provocations such as an order from a police officer. A person intoxicated with PCP may believe he has an unusual amount of strength and might believe he could pull a tree out of the ground. One of the effects of PCP is to produce anesthesia and reduce feelings of pain.

Dr. Aniline opined that defendant was under the influence of PCP at the time of the shooting of Wrede. However, he could not say whether, in fact, defendant deliberated, premeditated, or had the specific intent to kill or committed the fatal act with malice aforethought because of the uncertainty of the effects of PCP on an individual. He concluded that some of defendant's ability to think may have been impaired by his PCP usage.

In reaching his opinions, Dr. Aniline had not interviewed or examined defendant nor had he studied his background or medical history.

*Instructions.*

The jury was instructed on deliberate and premeditated first degree murder, unpremeditated murder of the second degree, voluntary and involuntary manslaughter, and the law relevant to voluntary intoxication. The jury found the defendant guilty of first degree murder and found true the special circumstance, the killing of Officer Wrede in the performance of his duties.

## GUILT PHASE ISSUES

The principal issue at the guilt phase relates to the admissibility of statements made by defendant while in the hospital. Other assignments of error concern one incident of alleged prosecutorial misconduct, the adequacy of instructions, and the sufficiency of evidence of premeditation and deliberation. In supplemental briefing defendant contends that the killing was accidental and that removal of the only Black juror from the jury panel violated his constitutional rights.

1. *Admissibility of Evidence.*

Defendant contends that the trial court erred in permitting the introduction of statements made to Detective Lee of the West Covina Police Department on the evening of the killing and at noon on the following day. The prosecution used the statements to establish that defendant, contrary to his claim of amnesia, had a memory of the confrontation with Officer Wrede. We find no error.

Near the end of its case-in-chief, the prosecution proposed to present to the jury admissions allegedly made by defendant to Detective Lee. The offer of proof indicated Lee would testify that defendant on one occasion asked whether he was being charged with killing a policeman and, on another occasion, asked whether he was being charged with killing a policeman with a shotgun. At a hearing outside the presence of the jury, the court heard the proposed testimony and overruled defense counsel's objections that the testimony was inadmissible on hearsay and relevancy grounds.

The record reveals that, after the shooting, defendant was taken to the West Covina jail and at about 1:45 p.m. transferred to the county hospital. Defendant showed the first signs of verbal responsiveness at about 3 p.m. and was questioned at that time for identification purposes by the officer who was assigned to guard him.

Detective Lee testified that he and Detective Bumcrot interviewed defendant in the jail ward of the county hospital at 5:50 p.m. on August 31, the day of the shooting. Defendant had been tied down and was extensively bandaged. Lee gave defendant *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) advisements; defendant agreed to talk and stated that he did not want an attorney "at that time."

Defendant told Lee that he spent the day at the home of a friend, James Butler, arriving at 9 or 10 in the morning and leaving at about 5 or 6 in the evening. When it was pointed out to defendant that it was not yet 6 p.m., defendant stated that he wasn't sure when he left Butler's house. Defendant then asked what he was arrested for and was told "murder." In a questioning voice, defendant stated, "I killed a policeman?" Lee testified: "At that time we advised him he was under arrest for murder and that no one had mentioned anything about a policeman."

Asked about the wounds on his face and body, defendant stated that he had received them in a fight with James Butler. At the end of the interview,

which lasted 10-12 minutes, defendant asked again why he was in custody and again was told, "murder." Defendant replied, "I didn't kill that cop."

The next day, September 1, 1983, at about noon, Lee had a second interview with defendant. Lee testified: "After the admonishment and the waiver of the constitutional rights we asked if he remembered who we were, and he replied, 'Yeah, you are the two policemen that said I killed that cop with a shotgun.' At that time we pointed out to him that we had not made a mention of a shotgun. He stated that he must have read it in the newspaper. We then asked how he could read a newspaper with his hands restrained down to the side of the hospital bed and his eyes almost swollen shut. He replied he was unsure where he had gotten the information about the shotgun."

On cross-examination Lee admitted that he was not present during the transportation of defendant from the scene of the crime to the hospital and that he was basing his testimony that "no one" had mentioned anything about a policeman or a shotgun on the fact that neither he nor Bumcrot had mentioned the killing of the officer to defendant. Lee also stated that, before the first interview, he inquired whether defendant had been medicated. The nurses were unaware of any medication being administered. Lee did not check before the second interview, but on redirect examination indicated that defendant appeared "responsive" and seemed to understand everything that was said to him.

The defense called various witnesses—the paramedics who transported defendant and the medical personnel who ministered to him at the hospital—who testified as to the ways in which defendant could have been apprised of what had happened. (None of these witnesses told defendant about the shooting.)

At trial, defense counsel had objected to the evidence of the interviews, first on the ground that statements made hours after the incident would be irrelevant to defendant's state of mind at the time of the homicide and, after examining the statements, on grounds that defendant's statements were denials, not admissions, and thus inadmissible hearsay. The prosecution argued that the statements were admissible as admissions of a party, not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party. (Evid. Code, § 1220.)

On appeal, defendant challenges the admission of the statements on the grounds asserted before the trial court—that they were hearsay and irrelevant—and adds that the waiver of *Miranda* rights was ineffective and involuntary because defendant was not competent to waive his rights.

(a) *Relevance.*

Except as otherwise provided by statute "all relevant evidence is admissible." (Evid. Code, § 351.) Section 210 of the same code provides: " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."

■ The trial court is vested with wide discretion in determining relevance under the stated standard (*People* v. *Green* (1980) 27 Cal.3d 1, 19 [164 Cal.Rptr. 1, 609 P.2d 468]) and though the trial court did not expressly address the objection, it impliedly found the statements relevant. That the evidence is relevant is obvious. It was relevant to show defendant's state of mind following the homicide, since the prosecution correctly anticipated the defense claims of unconsciousness due to drugs and of amnesia. Defendant's memory, i.e., his recall of events, was thus relevant to a major issue in the case—whether he was unconscious at the time of the shooting and had amnesia thereafter.

(b) *Hearsay.*

■ The trial court did not err in admitting the testimony of Detective Lee over defendant's objections on hearsay and relevancy grounds. The hearsay rule is stated in section 1200 of the Evidence Code. Subdivision (a) defines hearsay evidence: ". . . evidence of a statement that was made other than by a witness while testifying at the hearing and that is *offered to prove the truth of the matter stated.*" (Italics added.)

That portion of the interview to which defendant takes issue was not offered for the truth of the matter stated—i.e., that defendant had shot the officer or that defendant had shot the officer with a shotgun. The People's evidence, already presented, was overwhelming in that regard. Rather, it was offered as circumstantial evidence of the fact that defendant had a memory of the shooting. When offered for such purpose the statements were simply not hearsay (see *People* v. *Green, supra,* 27 Cal.3d 1, 23, fn. 9; *People* v. *Duran* (1976) 16 Cal.3d 282, 295 [127 Cal.Rptr. 618, 545 P.2d. 1322, 90 A.L.R.3d 1]).[3]

---

[3] See *Green, supra*, 27 Cal.3d at page 23, footnote 9, for discussion of the common mistake made by both prosecution and defense of treating this kind of statement as an item of hearsay that is saved by an exception to the hearsay rule for statements of a declarant's then-existing "state of mind." (Evid. Code, § 1250.) Here, the prosecution did not rely on Evidence Code section 1250 but rather Evidence Code section 1220—admission-of-party exception.

(c) *Voluntariness of Statements.*

Defendant challenges the admissibility of the statements on the ground they were involuntary, coerced, and obtained in violation of his right against self incrimination in that he lacked the mental capacity to waive his *Miranda* rights. Also, he claims that the statements were the product of an earlier interrogation—at 3 p.m. in the hospital emergency room—at which no *Miranda* warnings were given. And finally defendant argues that various instructions permitted the jury to consider the statements in an improper manner. Except as to the alleged instructional error, the simple answer to these challenges is that no objections were made. ■ A defendant must make a specific objection on *Miranda* grounds at the trial level in order to preserve a *Miranda* claim on appeal. (*People* v. *Milner* (1988) 45 Cal.3d 227, 236 [246 Cal.Rptr. 713, 753 P.2d 669].) Alternatively, however, defendant contends he was denied the effective assistance of counsel to the extent that counsel failed to object to the introduction of the evidence on voluntariness grounds and failed to request proper instructions.

■ Defendant bears the burden of proving ineffective assistance of counsel. (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) To establish constitutionally inadequate representation, the defendant must show that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's representation subjected the defense to prejudice, i.e., there is a reasonable probability that but for counsel's failings the result would have been more favorable. (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 216-218 [233 Cal.Rptr. 404, 729 P.2d 839]; see also *People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144]; *People* v. *Pope, supra,* 23 Cal.3d 412; see *Strickland* v. *Washington* (1984) 466 U.S. 668, 687-696 [80 L.Ed.2d 674, 693-699, 104 S.Ct. 2052].) When a defendant makes an ineffectiveness claim on appeal, the appellate court must look to see if the record contains any explanation for the challenged aspects of representation. If the record sheds no light on why counsel acted or failed to act in the manner challenged, "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation" (*People* v. *Pope, supra,* 23 Cal.3d at p. 426), the contention must be rejected. On this record, as we illustrate hereafter, defendant has not met his burden to establish the ineffectiveness of trial counsel.

(1) *Waiver.* ■ The record reveals that *Miranda* advisements were given by Detective Lee prior to the two interviews he conducted with defendant. The only "contrary" evidence is defendant's own testimony that

he could not remember whether he was given *Miranda* warnings. (Defendant testified to only one of the interviews with Lee.)

The claim of incapacity or incompetence is premised on defendant's physical and mental condition because of the confrontation with the officers and police dog and due to the ingestion of drugs. However, there is nothing in the record to indicate that defendant did not understand Detective Lee. Defendant's physical circumstances—the fact that he was in restraints and bandaged—apparently did not prevent him from participating in short, lucid interviews (10 or 12 minutes in each instance) during which he attempted to "cover himself," indicating (falsely) where he had received his wounds and where he had learned of the killing of the officer. Lee testified that defendant's responses seemed normal and that he (Lee) did inquire whether defendant had been medicated. The cold record supports a finding of voluntariness.

Insofar as defendant is claiming that he was incapacitated to waive his rights because of his ingestion of PCP and other drugs, he also cannot prevail. ■■ As we stated in *People v. Hendricks* (1987) 43 Cal.3d 584 [238 Cal.Rptr. 66, 737 P.2d 1350], "[t]he mere fact of voluntary consumption of alcohol does not establish an impairment of capacity," and here, as in *Hendricks,* the evidence showed that defendant was able to comprehend and answer all the questions that were posed to him. (*Id.* at p. 591.) (See also *People v. Loftis* (1984) 157 Cal.App.3d 229, 236 [203 Cal.Rptr. 590]; *People v. Taylor* (1980) 112 Cal.App.3d 348 [169 Cal.Rptr. 290]; *People v. Watson* (1977) 75 Cal.App.3d 384, 394 [142 Cal.Rptr. 134]; *In re Cameron* (1968) 68 Cal.2d 487 [67 Cal.Rptr. 529, 439 P.2d 633]].)

We may assume that counsel had knowledge of the legal principles involved and we cannot fault him for failing to make what would have been a fruitless objection. In sum, we conclude that counsel did not deprive defendant of a crucial defense and performed with "reasonable competence."

(2) *Tainted Fruit of Earlier Unlawful Interrogation.* ■ Defendant claims that he was "interrogated" at 3 p.m. without benefit of *Miranda* warnings while in the emergency room. He mischaracterizes the incident.

Throughout the trial there were references to the 3 p.m. questioning, described as questioning for identification purposes—name, age, etc.—conducted by the officer who was standing guard over defendant. It is clear that no "interrogation" in the *Miranda* sense was conducted.

In contending otherwise counsel now points to the testimony of Gerald Osacho, the nurse who attended defendant in the emergency room. In an

attempt to temporize the effect of defendant's statements as showing memory of the homicide, defense counsel called and questioned Osacho to show that defendant might have been apprised of the fact that a policeman had been shot before his interview with Detective Lee. Osacho gave a confused and ambiguous account of the emergency room discussion between the officer and defendant.

Asked about defendant's first statement upon becoming "verbal," Osacho testified: "I can't recall the very first thing. The first thing that pops into my mind is I believe it was the West Covina police officer asking him if he knew what he had done or maybe Mr. Jackson posing the question, 'What did I do[?]' Or—I think it was—my first recollection of him speaking in a lucid manner was conversing with the policeman and the policeman asking what had he done and him responding . . .

"Q. And what was Mr. Jackson's response to that question, if you recall?

"A. If I'm not mistaken, he said, 'I shot' or 'I killed the policeman.' Posing a question to the officer.

"Q. In other words, what you're saying is that in response to a question, he asked a question back and said in effect, 'I killed the policeman?' or something like that?

"A. I don't recall . . .

"Q. Anything said in the conversation between the two . . . regarding the type of weapon that was used, that you heard?

"A. No."

On cross-examination, the prosecutor elicited that defendant's first words, in response to questions by Osacho, were to state his name and to indicate that he had taken PCP; defendant thereafter responded to the officer's questions regarding personal, identifying information. The prosecutor then asked, "Do you remember sometime around, just before four o'clock, the defendant, before he left the hospital, the defendant saying without anybody asking him any questions, 'Why am I under arrest? Are you charging me with killing a cop?'" Osacho responded: "That seems consistent with my recollection."

Osacho's testimony is confusing and conflicting as to whether defendant's question indicating he had knowledge of the killing was a spontaneous statement or was in response to questioning of a police officer. It has not

been shown that trial counsel withdrew a potentially meritorious defense by not objecting to defendant's later statements on the ground urged here by defendant.

We conclude that defendant has not established, on this record, that there was an earlier interrogation necessitating a waiver of *Miranda* rights and, therefore, has not shown that he was denied the effective assistance of counsel.

(3) *Failure to Object to Instructions.* Defendant asserts that various instructions given by the court permitted the jury to improperly consider the erroneously admitted statements made to Detective Lee and that counsel was ineffective for failing to object. If the instructions were erroneous, no objection would have been required to permit appellate review. Having concluded that defendant's statements were properly admitted, however, we need not and do not reach the defendant's contention regarding the propriety of the instructions.

2. *Prosecutorial Misconduct.*

■ Defendant claims that the prosecutor engaged in misconduct during the cross-examination of defendant. It is argued that, while questioning defendant concerning his guilty pleas to outstanding drug charges, the prosecutor implied that defense counsel had "contrived" with defendant to fabricate a defense in the murder trial.

On direct examination defendant acknowledged his chronic use of PCP, admitting to use three or four times a week in the months before the homicide. He also testified on direct that he had been arrested or convicted for being under the influence of PCP on five or six occasions.

When the prosecutor inquired of defendant on cross-examination as to when he was arrested on the various drug charges, defense counsel renewed a motion, previously made and denied without prejudice, to preclude the prosecutor from going into the facts surrounding the arrests. When the prosecutor indicated that he was only interested in the dates of the arrests and/or convictions, the court overruled the objection, ruling that it would be a "fair question" for the prosecutor to ask defendant if he pled guilty to the offenses when he did because it would help him in establishing his PCP defense in the murder case.

The prosecutor thereafter established that the five or six misdemeanor PCP charges predated the homicide and that defendant pled guilty to all of the charges after he had been charged with the murder of Officer Wrede.

Defendant explained that he did so on the advice of the public defender who represented him on the drug charges and that he did so for the sake of convenience and to preclude "doing more time." Defendant denied that he pled guilty on the drug charges to bolster his PCP defense in the murder trial. Defendant points to the colloquy with the prosecutor as substantiating his claim that the prosecutor embarrassed and demeaned trial counsel by inferring that counsel helped him to fabricate a defense.[4]

The People deny that misconduct is revealed by the quoted record and claim, furthermore, that any error by the prosecutor was waived by failure to object. (*People* v. *Green, supra,* 27 Cal.3d 1.) We agree that there was no misconduct and, consequently, do not reach defendant's additional contention that trial counsel was ineffective for failing to object on the grounds now asserted.

The questions on cross-examination were not only proper in view of defendant's direct examination but were also relevant to show defendant's possible motive in pleading guilty to the PCP offenses when he did. There was nothing in the questioning to support the suggestion or inference that defense counsel in either the murder case or the PCP cases fabricated a defense on the instant charge. Defendant's reliance on *People* v. *Bain* (1971) 5 Cal.3d 839 [97 Cal.Rptr. 684, 489 P.2d 564] is misplaced.

*People* v. *Bain* was an extreme case of prosecutorial misconduct: "In the course of trial, the prosecutor asserted before the jury that the defendant and his counsel had fabricated the 'pick-up' story; he stated that he, as a Black man, would not be prosecuting a Black defendant unless he personally believed the man to be guilty; he attacked the integrity of the defense attorney and the office of the public defender; and he referred repeatedly to racial matters." (*Bain, supra,* 5 Cal.3d at p. 845.)

---

[4] We quote from the relevant parts of the cross-examination: "Q. And it was after [the murder charge] that you walked into court and pled guilty and said, 'I'm guilty of all those PCP things,' didn't you?

"A. No. That's when—pleaded guilty when I talked to my other public defender, and he advised me I should plead guilty because it don't make no sense to me going back and forth to this court, you might do more time, that what it was. It wasn't because of that, what you said, because it was a police officer, no, I never do, you know. . . .

"Q. Was there some little clue in your mind that maybe that would make you look more like a PCP user for the benefit of the jury in this case, that you might be able to beat your case on a PCP defense?

"A. No.

"Q. That was because you just wanted what was truth and right; you wanted to plead guilty when you were guilty; is that correct?

"A. Yes.

"Q. Good citizenship?

"A. Yes."

In sum, we reject defendant's claim of prosecutorial misconduct on both procedural and substantive grounds.

3. *Instructions.*

Defendant raises a number of issues relating to the jury instructions. Principally he faults the trial court for failure to give sua sponte instructions. In other instances he complains of the inadequacy of instructions given, either for deleting portions or for failing to delete portions from the standard instructions. He also claims that trial counsel was ineffective for failing to request the instructions. None of defendant's claims of instructional error has merit.

(a) *Failure to Sua Sponte Give Self-defense and Imperfect Self-defense Instructions.* (CALJIC Nos. 5.15, 5.17 and 5.12; also CALJIC Nos. 5.65 and 5.51.)

■ In support of his claim that the issue of self-defense is presented by the evidence, defendant states that Wrede "delivered the first blow"—to the back of defendant's knees—and that Wrede "wheeled his gun" toward defendant over the top of the police car. As a result, it is urged, defendant could have inferred that Officer Wrede "threatened and perceptibly was poised to take his life." Defendant's characterization of the facts is without support in the record.

One of the prosecution witnesses testified that when Wrede first approached defendant and the latter walked away, Wrede followed, "kind of tapped" defendant on the back of the knees, and told him to sit on the curb. Instead, defendant took a "karate stance" and commenced hitting the officer. The officer did not remove his gun from the holster until after defendant had removed the shotgun from the police car. Although witnesses described the tense scene as the two men faced each other, none testified that the officer "wheeled" his gun in the direction of defendant. Indeed, all of the witnesses testified that, after defendant appeared to comply with the officer's request to put the shotgun down, the officer lowered his gun as he started to move around the trunk of the car in the direction of defendant. Defendant pointed the shotgun at the officer and fired.

Thus, not only did defendant not rely on the theory of self-defense, but the record is devoid of any evidence that would support such a defense.

■ Further, defendant assigns error for failure to give a number of instructions on resistance to arrest and the use of excessive force by a peace officer. They are inapplicable here. Defendant's assertion that he did not

resist the officer until the latter hit him on the back of the knees with the baton does not support the claim of excessive force now made by appellate counsel. No claim of excessive force was ever made and no evidence of excessive force is presented in the record.

(b) *Failure to Instruct Sua Sponte on Mental Disease and Involuntary Intoxication.* (CALJIC Nos. 3.36 and 4.23.)

■ There was no evidence of, and the defense did not rely on, mental disease, defect, or disorder to mitigate malice or any other mental state. The trial court expressly modified CALJIC No. 3.36 for that reason and instructed: "Evidence has been received regarding a voluntary intoxication of the defendant at the time of the offense charged in Count I. You may consider such evidence solely for the purpose of determining whether or not the defendant actually formed the mental state which is an element of the crime charged in Count I to wit, murder."

Defendant points to the extensive evidence of defendant's longtime use of drugs. There was, however, no testimony regarding mental disease or defect which would warrant expansion of the instruction as now suggested. Contrary to defendant's assertion, the testimony of his wife at the penalty phase concerning the effect his drug use had on their lives was not evidence of mental disease; that testimony was only corroborative of testimony by other defense witnesses as to defendant's use of drugs over the years and its effect on him. Moreover, the wife's testimony was not before the trial court at the time of the guilt phase instructions and, even if it were, would not have supported the giving of the mental disease instruction.

In a similar vein, defendant contends that an *involuntary* intoxication instruction (CALJIC No. 4.23) should have been given. He asserts that Dr. Aniline testified that, as PCP is stored and accumulates, "the intoxication becomes in some measure involuntary." Defendant does not cite to the record and a careful reading of the record reveals no testimony by Dr. Aniline to support defendant's assertion. The process by which the PCP entered defendant's system was entirely voluntary. It is only when the ingestion is involuntary that we refer to "involuntary" intoxication. Here there is no evidence that defendant's intoxicated state was other than completely voluntary.

(c) *Failure to Instruct on Mistake of Fact.* (CALJIC No. 4.35.)

■ Relying on *People v. Scott* (1983) 146 Cal.App.3d 823 [194 Cal.Rptr. 633], defendant asserts that the court erred in failing to give an

instruction on mistake of fact.[5] The defendant in *Scott* unknowingly ingested a hallucinogenic drug and committed his crime under the delusion that he was a secret agent compelled to save his own and the President's life.

Defendant suggests that "at some critical moment in the episode [defendant] might have believed that the policeman was a public enemy of some kind, whom he would resist and vanquish." Such a suggestion is pure speculation, however, since the issue of mistake of fact based on a hallucinatory episode was not presented by the evidence produced in court and was not relied on by the defense. Indeed, a claim of mistake of fact would have been inconsistent with defendant's theory of defense and, therefore, the court was not required to instruct thereon on its own motion. (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 323 [185 Cal.Rptr. 436, 650 P.2d 311].)

Though a seeming non sequitur, defendant also contends that the giving of an instruction on involuntary manslaughter based on a killing while unconscious due to voluntary intoxication (CALJIC No. 8.47) somehow compounded the error in failing to give the mistake-of-fact instruction. The court correctly instructed on the lesser offense of involuntary manslaughter following its instruction on voluntary manslaughter. We find no error.

(d) *Error in Instructing on Intoxication and Specific Intent.* (CALJIC No. 4.21.)

 Defendant correctly argues that the trial court erred in instructing on intoxication as it relates to the mental states required for the offense charged. The court inadvertently instructed on diminished capacity in accord with former CALJIC No. 4.21: ". . . If from all the evidence you have a reasonable doubt whether defendant was *capable* of forming such specific intent, you must give him the benefit of that doubt and find that he did not have such specific intent." (Italics added.) However, as of January 1, 1982, the defense of diminished capacity was abolished (§§ 22, 28) and CALJIC No. 4.21 was revised to read "If . . . you have a reasonable doubt whether defendant *formed* such [specific intent] [mental state]" (italics added) the defendant must be given the benefit of the doubt.

The error was harmless, however, for the jury was otherwise instructed that the prosecution had the burden of proving all the elements of the crime

---

[5] The instruction on ignorance or mistake of fact (CALJIC No. 4.35) states: "An act committed or an omission made in ignorance or by reason of a mistake of fact which disproves any criminal intent is not a crime.

"Thus a person is not guilty of a crime if [he] [she] commits an act or omits to act under an honest [and reasonable] belief in the existence of certain facts and circumstances which, if true, would make such act or omission lawful."

and that the jury was required to find beyond a reasonable doubt that defendant possessed the necessary mental states required in the crime of murder. There is no reasonable probability that a result more favorable to defendant would have been reached had the correct instruction been given. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

(e) *Instruction on Involuntary Manslaughter.* (CALJIC No. 8.47.)

■■■ Defendant contends that the court erred in instructing on involuntary manslaughter. The trial court gave a standard involuntary manslaughter instruction.[6] Both the prosecution and defendant had requested the instruction. Further, there was evidence to warrant giving the instruction sua sponte, namely defendant's testimony that he had no memory of the shooting and Dr. Aniline's testimony on the effects of PCP on a chronic user. (See *People* v. *Balderas* (1985) 41 Cal.3d 144, 196, fn. 24 [222 Cal.Rptr. 184, 711 P.2d 480]; *People* v. *Tidwell* (1970) 3 Cal.3d 82, 86 [89 Cal.Rptr. 58, 473 P.2d 762]; *People* v. *Graham* (1969) 71 Cal.2d 303, 317, fn. 4 [78 Cal.Rptr. 217, 455 P.2d 153].) Mitigation of the requisite mental state due to drug intoxication was the primary theory of defense and, even if the defense had not requested the instruction, the court clearly had a sua sponte duty to instruct as it did on both voluntary and involuntary manslaughter.

Alternatively, defendant contends that the *sequence* of instruction was improper and could have led the jury to conclude that only unconsciousness could reduce defendant's crime to *manslaughter.* On the contrary, the instructions permitted the jury to find manslaughter if they found an absence of malice whether or not defendant was "unconscious."

The court instructed on voluntary and involuntary manslaughter. The jury was instructed first on the permissible use of evidence of intoxication (CALJIC No. 3.36). The court then gave a modified version of former CALJIC No. 8.41 on voluntary manslaughter, to wit: "Voluntary manslaughter is the intentional and unlawful killing of a human being without malice aforethought. There is no malice aforethought if the evidence shows that due to intoxication the defendant did not form the mental state constituting malice aforethought, even though the killing was intentional,

---

[6] The court instructed in the language of CALJIC No. 8.47: "If you find that the defendant killed while under the—while unconscious as a result of voluntary intoxication and therefore did not form a specific intent to kill or did not harbor malice aforethought, his killing is involuntary manslaughter.

"When a person voluntarily induces his own intoxication to a point of unconsciousness he assumes the risk that while unconscious he will commit acts inherently dangerous to human life or safety. Under such circumstances the law implies criminal negligence."

voluntary, deliberate, premeditated, and unprovoked." There followed the instruction on involuntary manslaughter based on a finding of unconsciousness due to intoxication. We conclude that the trial court did not err and that the jury could not have been confused by the sequence of instruction.[7] Further, any error in instructing on manslaughter is clearly harmless in light of the jury's first degree murder verdict which demonstrates that the jury specifically found that the killing was intentional.

(f) *Failure to Instruct on Partial Verdict.* (CALJIC No. 8.75.)

Defendant's contention in this regard is not entirely comprehensible. He faults trial counsel for failing to request, and the trial court for failing to give, the instruction on partial verdict. The instruction (CALJIC No. 8.75) is an attempt to satisfy the principles of *Stone* v. *Superior Court* (1982) 31 Cal.3d 503 [183 Cal.Rptr. 647, 646 P.2d 809], upon which defendant relies.

Neither *Stone* nor the instruction is applicable here. There was never an indication of jury deadlock and in fact the jury returned its guilty verdict in a little over four hours. We stated in *Stone* (31 Cal.3d at p. 519) that the trial court "is constitutionally obligated to afford the jury an opportunity to render a partial verdict of acquittal on a greater offense when the jury is deadlocked only on an uncharged lesser included offense." We proposed two alternatives, which have been incorporated in CALJIC No. 8.75: (1) provide the jury with verdict forms on the charged and lesser included offenses, precluding the jury from returning a verdict on a lesser offense without also returning a verdict on the greater offense, or (2) withhold any instruction until a deadlock has been announced.

Although the trial court could have given CALJIC No. 8.75 at the outset of deliberations in anticipation of a possible deadlock on a lesser included offense, it did not err in choosing the second alternative, that is, wait to see whether a deadlock occurs and give the instruction only if and when it does. (See *People* v. *Kurtzman* (1988) 46 Cal.3d 322, 332, fn. 9 [250 Cal.Rptr. 244, 758 P.2d 572]; *People* v. *Soto* (1984) 157 Cal.App.3d 694, 713 [204 Cal.Rptr. 204].)

---

[7] The jury was instructed that they must consider the instructions as a whole, each in light of all the others, and that the order in which they were given was of no significance. (CALJIC No. 1.01.)

(g) *Instruction on Special Circumstance: Killing of a Peace Officer While Engaged in the Performance of His Duties.* (Failure to give CALJIC Nos. 8.81.8, 8.83, 9.55, 9.56, 9.57 and 9.58.)

The only assignment of error as to the special circumstance allegation concerns the instruction given thereon. The trial court gave the introductory instruction on special circumstances (§ 190.2; CALJIC No. 8.80) and the requirements for finding the special circumstance of murder of a peace officer (§ 190.2, subd. (a)(7); CALJIC No. 8.81.7) and defined "performance of official duties" (CALJIC No. 8.81.8). Defendant's assignment of error in the instruction on the special circumstance is patently without merit.

Defendant argues that there is substantial evidence that the officer was not engaged in the performance of his duties at the time of his death and that the instructions were deficient for failure to so advise the jury. It is defendant's position that the officer's conduct was so aggressive that he lost his peace officer status. On proper instruction, the jury concluded otherwise.

Despite defendant's assertion to the contrary, the jury *was* instructed in the language of CALJIC No. 8.81.8, not only in regard to what constitutes a lawful arrest, but also—and more pertinent to this case—what constitutes reasonable cause to detain for investigation. Further, the jury *was* instructed as to the sufficiency of circumstantial evidence—CALJIC No. 8.83 was given in its entirety.

The remaining instructions which, it is urged, should have been given relate to principles of law that are applicable where a defendant is charged with resisting an officer in the performance of his duties (§ 148) or with assault on a peace officer (§ 245, subd. (b)) *and* the defendant raises a defense of unlawful arrest by reason of excessive force. Here, as in the contentions regarding self-defense, the question of excessive force has no factual evidentiary basis nor is it consistent with the theory of defense.

The evidence is undisputed that Officer Wrede approached defendant based on information from several sources that defendant was acting in a bizarre manner. It is undisputed that the officer had cause to believe defendant was under the influence of PCP, a reasonable suspicion sufficient to justify a detention for investigation. It is also undisputed that defendant refused to comply with the officer's orders.

(h) *Failure to Instruct Sua Sponte on "Implied Malice" Murder.* (CALJIC Nos. 8.31 and 8.11.)

 Finally, defendant contends that the trial court erred in failing to instruct on "implied malice" second degree murder.

The jury was instructed on first degree murder—deliberate and premeditated killing with express malice (CALJIC No. 8.20). It was also instructed on second degree unpremeditated murder—an intentional killing without deliberation and premeditation (CALJIC No. 8.30). The court gave the portion of CALJIC No. 8.11 defining express malice—intent to kill—but deleted the portion defining implied malice.

Defendant postulates that the jury might have found second degree "implied malice" murder on the basis of his taking and operating the shotgun, conduct posing a high probability of danger to life.[8]

 It is settled law that the trial court must instruct sua sponte on the general principles of law relevant to the issues raised by the evidence. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 715-716 [112 Cal.Rptr. 1, 518 P.2d 913].) Regarding defenses, *Sedeno* requires sua sponte instructions on particular defenses if relied on by defendant or if there is substantial evidence supportive of the defense and it is not inconsistent with defendant's theory of the case. (*Id.* at p. 716; *People* v. *Wickersham, supra,* 32 Cal.3d at p. 326.)

 Here, however, in view of the jury having found a premeditated, deliberate, first degree murder, any error in failing to instruct on implied-malice second degree murder would clearly be harmless. (See *People* v. *Sedeno, supra,* 10 Cal.3d 703, 720-721.) Accordingly, we need not and do not decide whether, on the particular facts of this case, the court should have instructed on second degree "implied malice" murder.

4. *Sufficiency of Evidence of Premeditation and Deliberation.*

 Defendant contends that there was insufficient evidence of premeditation and deliberation to support a verdict of first degree murder. In reviewing the sufficiency of the evidence, we must draw all inferences in support of the verdict that can reasonably be deduced and

---

[8] CALJIC No. 8.31 instructs: "Murder of the second degree is also the unlawful killing of a human being when: [¶] 1. The killing resulted from an intentional act, [¶] 2. The natural consequences of the act are dangerous to human life, and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. [¶] When the killing is the direct result of such an act, it is not necessary to establish that the defendant intended that his act would result in the death of a human being."

must uphold the judgment if, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; *People* v. *Miranda* (1987) 44 Cal.3d 57, 86 [241 Cal.Rptr. 594, 744 P.2d 1127].)

In *People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942], we set out three categories of evidence which might sustain a finding of premeditated murder: (1) facts about a defendant's behavior before the killing that show prior planning; (2) facts about defendant's conduct with the victim from which the jury could infer a motive, and (3) facts about the manner of the killing from which the jury could infer that the defendant intentionally killed the victim according to a preconceived plan.

The record shows ample evidence of premeditation pertaining to at least two of the three categories. While the evidence of "prior" planning is somewhat meager, the evidence that exists is strong, especially the testimony regarding defendant's repeated efforts to cock the shotgun and ready it for firing. It has been recognized that premeditation can occur in a very brief period of time. (*People* v. *Velasquez* (1980) 26 Cal.3d 425, 435 [162 Cal.Rptr. 306, 606 P.2d 341]: " 'The true test is not the duration of time as much as it is the extent of reflection . . . .' ") While there is no evidence that defendant contemplated the possibility of murder prior to his encounter with Officer Wrede, the fact that defendant followed the retreating officer to the police car and exerted himself in order to obtain the shotgun at a time when the officer was merely using the radio, and then did use the gun against the officer, suggests that defendant in that period of time contemplated killing the officer.

As to motive, the evidence establishes that defendant became angry when approached by Officer Wrede and when asked his name, answered, "It's none of your fucking business." His anger accelerated in intensity as he assumed a "karate-type stance" and attacked the officer. Though witnesses described the officer's approach, none could pinpoint the reason for defendant's fatal response. However, "the law does not require that a first degree murderer have a 'rational' motive for killing. Anger at the way the victim talked to him . . . may be sufficient." (*People* v. *Lunafelix* (1985) 168 Cal.App.3d 97, 102 [214 Cal.Rptr. 33].) In *People* v. *Miranda, supra,* 44 Cal.3d 57, 87, the defendant became angry when the victims refused to sell him beer—he believed the victims were being rude to him.

The manner of killing also evidences reflection. Both prosecution and defense witnesses testified that defendant appeared to comply with the

officer's command to put the gun down. However, he kept his hand on the gun near the trigger. When the officer no longer pointed his gun at defendant and moved to come around the police car, defendant aimed at him and fired.

We conclude that the evidence, viewed in the light most favorable to the prosecution, supports a finding of premeditated and deliberate first degree murder.

### 5. *Sufficiency of Evidence of Intent to Kill.*

█ In supplementary briefing, defendant contends that the killing was accidental and directs our attention to the ballistics evidence which, he urges, shows that defendant did not aim at the officer and therefore could not have intended to kill. We treat this contention as a challenge to the sufficiency of the evidence of express malice, i.e., the intent to kill.

Defendant claims that the ballistics evidence, i.e., the presence of shotgun pellets in the lightbar of the patrol car, and the autopsy report, which reveals that only one pellet entered the police officer, support a finding that defendant aimed at the lightbar, not the officer, and that the injury to the officer resulted from a ricocheting shotgun pellet.[9]

The evidence, which defendant now describes as "exculpatory," was before the jury. Also before the jury was the testimony of prosecution and defense witnesses who stated that defendant "aimed" at the officer or "pointed the gun" directly at the officer. Not only did the eyewitnesses specifically testify that defendant aimed at the officer before firing, but the very act of firing a shotgun toward the officer at that distance would permit an inference of intent to kill from the manner of killing. (See *People* v. *Cruz* (1980) 26 Cal.3d 233, 245 [162 Cal.Rptr. 1, 605 P.2d 830].)

As noted in the discussion of the sufficiency of the evidence of premeditation and deliberation (*ante,* p. 1200), defendant's activity prior to the shooting also supports a finding of intent to kill—ripping the gun from the patrol car, attempting to cock the shotgun before pointing it at the officer, pointing and pulling the trigger, cocking the gun and pointing it again, then pretending to comply with the officer's directions in laying the gun down, but watching the officer's movements and finally picking up the gun and pointing it a final time at the officer. Defendant's conduct and threats to kill other officers following the killing of Officer Wrede also support the finding of an intent to kill.

---

[9] Each shotgun shell had nine pellets. Three or four were found in the lightbar.

### 6. *Excusal of Black Jurors.*

 Relying on what he calls the "rule" of *Griffith* v. *Kentucky* (1987) 479 U.S. 314 [93 L.Ed.2d 649, 107 S.Ct. 708], defendant contends it was prejudicial error to try a Black defendant with an all White jury. The contention is patently unmeritorious.

*Griffith* holds that newly declared constitutional rules are applicable to criminal cases pending on appeal. The rule in question in *Griffith* was the holding in *Batson* v. *Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712], that a state criminal defendant can establish a prima facie case of racial discrimination violative of the Fourteenth Amendment based on the prosecution's use of peremptory challenges to strike members of the defendant's race from the jury venire and that, once the defendant has made the prima facie showing, the burden shifts to the prosecution to come forward with a neutral explanation for those challenges. (See *People* v. *Murtishaw* (1989) 48 Cal.3d 1001, 1013 [258 Cal.Rptr. 821, 773 P.2d 172]; *People* v. *Carrera* (1989) 49 Cal.3d 291, 326-327 [261 Cal.Rptr. 348, 777 P.2d 121].)

The prosecution here peremptorily challenged Mr. Cummings, one of two Black jurors on the panel. Defense counsel made no objection to the excusal of Cummings. Later, both the prosecution and the defense stipulated to the excusal of the second Black juror, Mr. Ash. Absent an objection at voir dire, we have no *Batson/Griffith* problem here. Insofar as establishing that trial counsel was ineffective for failing to object on *Wheeler* grounds (*People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]), the record does not affirmatively reveal that counsel had no rational tactical purpose for failing to object (*People* v. *Fosselman, supra,* 33 Cal.3d 572, 581.)

### PENALTY PHASE FACTS

At the penalty phase, the prosecution introduced certified copies of documents pertaining to a 1975 trial and conviction for second degree burglary. The prosecution also introduced evidence of a 1976 forcible sodomy on a young soldier while defendant was in the army at the basic training camp in Fort Knox, Kentucky, and of a 1983 assault on a West Covina police officer while defendant was under the influence of PCP.

The victim of the sodomy described the incident during which defendant, apparently "drunk and high on weed," forcibly sodomized the young victim.

Officer Bennallack testified to the 1983 assault in a fast food store during which he suffered a broken hand and a cracked wrist. The 1983 incident

paralleled, in some respects, the events of the present case. Shortly after midnight on July 5, Bennallack approached defendant, who appeared rigid, agitated, nervous, and combative, to investigate the possibility he might be under the influence of PCP. When defendant refused the officer's request to "come outside and talk," the officer put his hand on defendant's shoulder and said, "Come on, let's go outside." Defendant pushed Bennallack aside, grabbed him with both hands, ripped the police badge from the shirt, and stated he wasn't going outside.

Concluding that defendant was under the influence of PCP, the officer hit defendant across the knees to make him sit down. That had no effect so he struck defendant across the face and got him to the ground. Bennallack sat on defendant, but was unable to handcuff him without the assistance of a second officer. Defendant was totally uncooperative at the jail and during the booking told Bennallack that he was going to rape his wife and kill his children.

Defendant's wife and mother testified for defendant. Sabrina Jackson testified that she was married to defendant for 10 years and separated from him 3 years before the shooting incident. Drugs were the cause of the breakup of the marriage after unsuccessful attempts in encouraging him to seek psychiatric help for his problem. Sabrina stated that defendant was always a good father to their three children and during the separation continued to see and do things with them. He provided financial support whenever he was working. She described defendant as a good and unselfish person, an individual who minded his own business. Sabrina felt that the jury's verdict was "unfair" because they did not take into account that he was under the influence of PCP at the time of the shooting.

Defendant's mother, Lillian Williams, testified that in his formative years defendant had an uncaring father who was in and out of the household, a father who refuses even now to visit his son. Defendant was 14 when Lillian divorced defendant's father and married a man with 6 children. Defendant's problems started at that time—he started sniffing glue with his friends. Defendant later entered the military but was not successful there and received a dishonorable discharge.

Lillian described her son as a good person who was sick and in need of help. She saw him as "two different people," depending on whether or not he was on drugs. Although Lillian asserted that defendant posed no problems while in school, she acknowledged on cross-examination that he spent the 10th grade in custody because of a robbery and dropped out of school weeks into the 11th grade. Thereafter he was involved in burglary and theft in 1969 and he was convicted of robbery in juvenile court in 1972. The

mother attributed all of defendant's problems to his involvement with drugs.

## PENALTY PHASE ISSUES

More than half of defendant's opening brief is devoted to a constitutional challenge to the death penalty as cruel and unusual. Because the challenge is patently without legal merit, we treat the contention only briefly.

### 1. *Constitutionality of Death Penalty.*

██ In support of his claim that imposition of the death penalty violates the Eighth and Fourteenth Amendments, defendant relies on certain historical facts which he claims establish that the framers of the Constitution intended to ban the death penalty when they prohibited cruel and unusual punishment.

In *Gregg v. Georgia* (1976) 428 U.S. 153, 176 [49 L.Ed.2d 859, 876, 96 S.Ct. 2909] the United States Supreme Court noted that for nearly two centuries it had repeatedly and often expressly recognized capital punishment was not invalid per se, and in *Gregg* the court reiterated that the imposition of the death penalty did not violate the prohibition against the infliction of cruel and unusual punishment under the federal Constitution. The high court's holding is binding authority on this court. (Cal. Const., art I, § 27; *People v. Ramos* (1984) 37 Cal.3d 136, 153 [207 Cal.Rptr. 800, 689 P.2d 430].)

Contrary to defendant's argument that the high court has never considered the intent of the framers of the Constitution, the *Gregg* opinion notes that the drafters of the Eighth Amendment were primarily concerned with banning "'tortures' and other 'barbarous' methods of punishment." (428 U.S. at pp. 169-170 [49 L.Ed.2d at p. 872].) The *Gregg* court also stated that "it is apparent from the text of the Constitution itself that the existence of capital punishment was accepted by the Framers." (*Id.* at pp. 176-177 [49 L.Ed.2d at p. 877].) The high court clearly considered the intent of the framers when it concluded capital punishment did not violate the Eighth Amendment of the Constitution.

What defendant is seeking is an opportunity to relitigate and rehear the *Gregg* case. We have no authority to provide that opportunity. (Cal. Const., art. I, § 27.)

### 2. *Effective Assistance of Counsel.*

Defendant challenges the effectiveness of the assistance of trial counsel. He points to three instances of alleged prosecutorial misconduct during the

closing argument at the penalty phase and faults trial counsel for failing to object.

(a) *Lack of Remorse.*

While reviewing the evidence of the nature of the crime—the first aggravating factor—the prosecutor said, "Another thing about the nature of the crime, what happened after the defendant murdered the officer? He didn't say, 'Oh, my God, what have I done?' He continued." The prosecutor then discussed defendant's pursuit with the shotgun of the other officers who had come to the scene after Wrede was killed.

Defendant contends that the prosecutor's argument was an improper comment on defendant's failure to express remorse for the murder. We disagree. Taken in context, the comment merely described actions after the crime which would support weighing the nature of the crime as an aggravating rather than mitigating factor. The comment did not refer directly or indirectly to defendant's effort to maintain his innocence.

The Attorney General points to another remark by the prosecutor which might more appropriately be considered a comment regarding defendant's lack of remorse: "Did he show any sympathy for Ken Wrede's death or Ken Wrede's family or anything else? I suggest that he didn't." As the Attorney General also notes, however, a statement to the effect that remorse, a nonstatutory factor in mitigation (*People* v. *Ghent* (1987) 43 Cal.3d 739, 771 [239 Cal.Rptr. 82, 739 P.2d 1250]), was absent, is not improper comment. (*People* v. *Coleman* (1969) 71 Cal.2d 1159 [80 Cal.Rptr. 920, 459 P.2d 248].) Trial counsel was not inadequate, therefore, for failing to object to the prosecution's argument.

(b) *Defendant's Courtroom Demeanor.*

During argument the prosecutor stated: "Another aspect of sympathy is, if you take a look at the defendant, and I don't know whether you've seen him—because you have a right to look at him, his attitude or his demeanor whether he was sitting on the witness stand or when he was sitting over here—*exactly some sort of a smirk for the most part.*"

Defendant contends that the prosecutor's reference to his attitude or demeanor constituted misconduct and that trial counsel was ineffective for failing to object. Insofar as the prosecutor's comment referred to defendant's demeanor while on the stand, the comment was proper. The jury had been instructed pursuant to Evidence Code section 780, subdivision (a),

that, in determining the believability of a witness, the demeanor and manner of the witness while testifying was a factor to consider.

Comments on defendant's off-the-stand courtroom demeanor may not be improper during the penalty phase, for the jury may, in appropriate circumstances, consider a defendant's courtroom behavior and demeanor in its sentencing determination. In *People* v. *Heishman* (1988) 45 Cal.3d 147 [246 Cal.Rptr. 673, 753 P.2d 629], during penalty phase argument, the prosecutor referred to defendant's facial expressions. We held that where a defendant has placed his own good character in issue as a mitigating factor, it is "proper for the jury to draw inference on that issue from their observations of defendant in the courtroom and therefore proper for the prosecutor to base a closing argument on such observations." (*Id.* at p. 197.) Here, as in *Heishman,* defense witnesses at the penalty phase spoke to defendant's good character and positive attributes when not under the influence of drugs and the jury could draw inferences in that regard from their observations of him in the courtroom.

(c) *Comment on Exercise of Constitutional Rights.*

 Defendant contends that certain comments by the prosecutor urged the jury to penalize defendant for exercising his constitutional rights of going through a trial.

The prosecutor commenced his argument, "Well, first of all, I intend to ask you to return a verdict of death against Mr. Jackson. And as an overriding thought to some of the things I would like to say, the defendant has had a trial and all of the rights that are afforded to everybody. Ken Wrede didn't have. A verdict of death will show policemen out there who go to work everyday that their lives are as important as at least the criminal, this defendant's."

The People urge that the argument was merely fair comment on the evidence (*People* v. *Wein* (1958) 50 Cal.2d 383, 396 [326 P.2d 457]), i.e., that defendant did not afford the officer any consideration when he ripped the shotgun from the police car and shot the officer at close range.

The comments were somewhat ambiguous. At the very least, the argument emphasized what the jurors already knew—that the victim of the murder was a policeman doing his duty—and suggesting that fact should be considered in the decision on penalty. At the very most, the argument brought to the jury's attention the increasing menace of criminal conduct directed against police officers, unsupported in the evidence and irrelevant. In any event the comments were not so ambiguous as to support defend-

ant's interpretation—the argument did not urge the jury to return a death verdict *because* defendant exercised his constitutional rights and did not suggest that defendant should be given a greater penalty *because* he had a trial. (Cf. *Bruno* v. *Rushen* (9th Cir. 1983) 721 F.2d 1193, 1194.)

We discount the defendant's interpretation of the prosecutor's remarks and conclude there was no misconduct.

### 3. *Easley Error.*

Defendant assigns *Easley* "factor (k)" error (§ 190.3, factor (k))— the jury was not instructed that it might consider as a mitigating factor any aspect of defendant's character or record. In *People* v. *Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813], we held that factor (k) could in some situations unduly limit the jury's consideration of evidence relating to the general character, family background, or other aspect of the defendant. Here, however, the jury was not given an unadorned factor (k) instruction.

The trial court correctly gave an expanded instruction as suggested in *Easley.* The court instructed: "As to those factors that you find to be mitigating, they are only examples of some of the factors that you may consider in determining punishment in this case. You should pay careful attention to them and give them the weight to which you find them to be entitled. You are not required to limit your consideration of mitigating circumstances to these factors. You may also consider other circumstances relating to the case *or to the defendant* as reasons for not imposing the death sentence. Any mitigating circumstance, standing alone, may be sufficient to support a decision that life without the possibility of parole is the appropriate punishment, provided that the mitigating circumstance or circumstances outweigh(s) any aggravating circumstance or circumstances." (Italics added.) The jurors were also instructed they could be influenced by sympathy or pity for defendant.

Although the prosecutor argued for the death penalty and stressed that it was defendant who elevated matters to deadly force while the police officer showed restraint, he nevertheless noted that "fairness and mercy" were the operative words in the only mitigating factor he thought was applicable, defendant's intoxication at the time of the crime.

And finally, in his argument defense counsel stressed defendant's background and the effects of an impoverished environment, referring again and again to the testimony of defendant's wife and mother.

We reject defendant's claim of *Easley* error.

4. *Brown Error.*

 Defendant's claim of *Brown* (*People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440]) error—that the jury was instructed in a mechanical application of the weighing process and that the prosecutor, and defense too, committed prejudicial misconduct in concurring with the erroneous instruction—is entirely without foundation in the record. And defendant does not cite to the instruction or to the arguments of counsel.

The instruction quoted in the previous section (*ante,* p. 1207) clearly told the jurors that they were to give the mitigating and aggravating factors whatever weight they chose. The prosecutor in his argument, and defense counsel in his, reiterated that it was in the discretion of the jurors to determine the weight to be given each factor. The jury could not have been misled about the nature of the weighing process.

5. *Circumstances of Crime as Aggravating Factor.*

 Defendant contends that use of the circumstances of the crime *and* the existence of a special circumstance as an aggravating factor constitutes an impermissible "double use of weights." In *Lowenfield* v. *Phelps* (1988) 484 U.S. 231 [98 L.Ed.2d 568, 108 S.Ct. 546], the court held that a death sentence could be imposed even where the sole aggravating factor found by the jury was identical to an element of the capital crime of which the defendant was convicted. (See also *People* v. *Garrison* (1989) 47 Cal.3d 746, 793 [254 Cal.Rptr. 257, 765 P.2d 419]; *People* v. *Gates* (1987) 43 Cal.3d 1168, 1208 [240 Cal.Rptr. 666, 743 P.2d 301]; *People* v. *Balderas, supra,* 41 Cal.3d 144, 200-201.)

6. *Admission of Unadjudicated Crimes.*

Defendant repeats the oft-rejected contention that it is unconstitutional to allow the jury to consider in its penalty determination violent crimes on which defendant was neither charged nor convicted. We rejected a similar claim in *People* v. *Balderas, supra,* 41 Cal.3d at pages 204-205, and have declined invitations to reevaluate that decision (see *People* v. *Malone* (1988) 47 Cal.3d 1, 48 [252 Cal.Rptr. 525, 762 P.2d 1249]; *People* v. *Gates, supra,* 43 Cal.3d at p. 1202).

CONCLUSION

The judgment is affirmed.

Lucas, C. J., Eagleson, J., Kaufman, J., and Kennard, J., concurred.

**MOSK, J.**—I concur in the judgment.

I write separately because I believe defendant's claim of so-called *"Brown"* error is more substantial than may appear from a reading of the majority opinion. (*People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440], revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837].)

The court instructed the jurors in accordance with the mandatory-penalty-determination language of Penal Code section 190.3 (hereafter section 190.3) as that language was incorporated in a modified version of a standard instruction: "If you conclude that the aggravating circumstances outweigh the mitigating circumstances, *you shall impose the sentence of death.*" (Italics added.) The final paragraph of section 190.3, on which the foregoing instruction was based, declares: "*the trier of fact . . . shall impose a sentence of death* if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances." (Italics added.)

In *Brown* we construed the final paragraph of section 190.3 as follows in order to avoid the serious Eighth Amendment questions that would arise if the jury were deprived of discretion to decline to fix the penalty at death. "In this context, the word 'weighing' is a metaphor for a process which by nature is incapable of precise description. The word connotes a mental balancing process, but certainly not one which calls for a mere mechanical counting of factors on each side of the imaginary 'scale,' or the arbitrary assignment of 'weights' to any of them. Each juror is free to assign whatever moral or sympathetic value he deems appropriate to each and all of the various factors he is permitted to consider . . . . By directing that the jury 'shall' impose the death penalty if it finds that aggravating factors 'outweigh' mitigating, the statute should not be understood to require any juror to vote for the death penalty unless, upon completion of the 'weighing' process, he decides that death is the appropriate penalty under all the circumstances. Thus the jury, by weighing the various factors, simply determines under the relevant evidence which penalty is appropriate in the particular case." (40 Cal.3d at p. 541, fn. omitted.)

Stated simply, the jury is "require[d] . . . to make a moral assessment on the basis of the character of the individual defendant and the circumstances of the crime and thereby decide which penalty is appropriate in the particular case." (*People* v. *Bonin* (1989) 47 Cal.3d 808, 856 [254 Cal.Rptr. 298, 765 P.2d 460].) In other words, "The jury is not simply to determine whether aggravating factors outweigh mitigating factors and then impose

the death penalty as a result of that determination, but rather it is to determine, after consideration of the relevant factors, whether under all the circumstances 'death is the appropriate penalty' for the defendant before it." (*People v. Myers* (1987) 43 Cal.3d 250, 276 [233 Cal.Rptr. 264, 729 P.2d 698] (lead opn. by Grodin, J.).)

Although in *Brown* we upheld the constitutionality of the final paragraph of section 190.3, we nevertheless recognized that when delivered in an instruction that provision's mandatory-penalty-determination language might mislead jurors as to the scope of their sentencing discretion, to the defendant's prejudice, in violation of Eighth Amendment principles. (40 Cal.3d at p. 544, fn. 17.) Specifically, that language might be understood to define the penalty determination as "simply a finding of facts" (*id*. at p. 540) or "a mere mechanical counting of factors on each side of the imaginary 'scale[]'" (*id*. at p. 541). In other words, it might mislead the jurors as to the nature of the process by which they are to determine penalty. The language might also be understood to require a juror to vote for death if he finds that aggravation outweighs mitigation—even if he determines that death is not the appropriate penalty under all the circumstances. (See *id*. at pp. 540-544.) That is to say, it might mislead the jurors as to the character of the ultimate question they are to resolve in the process of determining penalty.

Although the question is close, I believe that in the context of this case the instruction under challenge would not have misled reasonable jurors as to the scope of their sentencing discretion.

Specifically, the *Brown* court's first concern was not substantially implicated in this case. Indeed, it was not implicated at all: neither court nor counsel suggested that the penalty determination was "simply a finding of facts" (*People v. Brown, supra,* 40 Cal.3d at p. 540) or "a mere mechanical counting of factors on each side of the imaginary 'scale[]'" (*id*. at p. 541). Therefore, reasonable jurors would not have been misled as to the nature of the penalty-determining process.

Nor was the *Brown* court's second concern substantially implicated. It is true that in a comment in the course of his summation the prosecutor referred to the mandatory-penalty-determination language. But the remark was brief and unemphatic—and was overshadowed by argument focusing on the facts of the case and not the words of the instruction. It is also true that certain parts of the instructions suggested the crucial question was simply whether aggravation outweighed mitigation or vice versa, and that certain comments in the summations were in accord. But it appears that on this record reasonable jurors would not have concluded that they were

required to vote for death if they found aggravation outweighed mitigation—unless they determined that death was appropriate under all the circumstances. Therefore, such jurors would not have been misled as to the character of the ultimate question in the penalty-determining process.

For these reasons, I conclude that on this record the challenged instruction would not have misled reasonable jurors as to the scope of their sentencing discretion. Therefore, in this case I find no *Brown* error.

Accordingly, I concur in the judgment.

Broussard, J., concurred.

Appellant's petition for a rehearing was denied February 15, 1990.