Filed 7/16/14  P. v. Khankhanian CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B242215 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA078692) |
| v. | |
| SINA KHANKHANIAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Katherine Mader, Judge.  Remanded for resentencing but otherwise affirmed.

Dan Mrotek, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Sina Khankhanian was driving north on Pacific Coast Highway (PCH) when he hit a pedestrian, 13-year-old Emily S., causing her death.  Appealing from his conviction of second degree murder, defendant contends the trial court prejudicially erred by:  (1) instructing on express malice; (2) refusing to modify the instruction on implied malice; and (3) ordering an enhancement to run concurrently.[1]  We remand for resentencing on the enhancement, but otherwise affirm the judgment of conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The People's Case*

### 1.    The Collision

Viewed in accordance with the usual rules on appeal (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358), the evidence established that sometime before 5:00 p.m. on April 3, 2010, defendant drove his blue Mitsubishi Lancer west on Topanga Canyon Road, then north on PCH until the collision at PCH and Heathercliff, a total of about 17 miles.  A number of witnesses described the dangerous manner in which defendant was driving, including speeding, tailgating, lane splitting and using the shoulder to pass slower traffic.  Several drivers called 911 to report defendant's reckless driving.  At about 5:00 p.m., Nancy Engh was in the left hand turn lane waiting to turn from northbound PCH to westbound Heathercliff.  Engh saw Emily walking along PCH, close to the embankment.  A "blur of speed" in her rear view mirror attracted Engh's attention.  Engh saw defendant's car in the number one lane, coming towards her at a high rate of speed.  Defendant made a quick turn to the right.  As Engh looked to her right, she saw defendant's car flip over onto the driver's side, then slide north and east along the side of

---

[1]    Defendant was charged by information with murder and four counts of assault with a deadly weapon; enhancements for personal use of a deadly weapon were alleged.  Defendant's Penal Code section 995 motion to dismiss the assault charge was granted.  Defendant's first jury trial on the murder charge ended in a mistrial when the jury could not reach a unanimous verdict.  A second jury found defendant guilty of murder and found true the deadly weapon enhancement.  Defendant was sentenced to 15 years to life for murder, plus a concurrent one year for the enhancement.  Defendant timely appealed.

2

the road.  When Engh looked for Emily, she was not there.  Engh concluded that Emily had been hit by defendant's sliding car.  Afraid that Emily might be under the car, Engh pulled over and ran back to the crash site to help.  Engh urged defendant to get out before his car exploded.  Defendant responded, "Fuck you.  Leave me alone.  Fuck off.  I want to die.  Just leave me alone."  Engh went up the hill in search of Emily, whom she found on the ground, between 30 and 40 feet from where defendant's car had come to rest.

According to Emergency Medical Technician (EMT) Tim Corliss, when he arrived at the location where Emily was lying face down on the ground, she was "all busted up" and her breathing was "basically your last gasps before you die."  Emily died in the ambulance on the way to where a helicopter was waiting to transport her to the hospital.

After Emily was taken away, Engh saw defendant handcuffed to a gurney being loaded into an ambulance.  She walked up to him and said, "Fuck you, you piece of shit.  She was a beautiful young girl.  And her father was just here."  Defendant replied, "Fuck off.  Do you think I give a fuck about your life?"

Rochelle Huppin and Errol Valencia also witnessed the collision.  Huppin was driving north on PCH when she noticed defendant behind her, "driving crazily."  Huppin estimated that defendant was driving at least 75 miles per hour when he passed her.  Huppin next saw "something fly" and then defendant's car "was airborne.  And it hit a wooden power pole that snapped like a toothpick."  Police arrived at the scene within two minutes.  Defendant resisted police officers' efforts to pull him from his car.  Huppin heard defendant screaming, yelling, and cursing.  Valencia, who was also driving north on PCH, saw defendant speeding, darting in and out of traffic and driving on the shoulder of the highway.  Defendant suddenly "sped up even more, and he made a sharp right turn into the embankment.  And that's when he crashed."

Deputy Sheriff Dustin Morales testified that defendant resisted his efforts to be removed from the car.  Defendant said, "I want to stay in my car.  Leave me the fuck alone.  I wanted to run off the road and hit the pole.  I did it on purpose."  After fire fighters removed the front windshield of defendant's car, Morales was able to get

3

defendant out, handcuffed and placed in the back of Morales's patrol car. Morales answered in the affirmative when defendant asked if he had hurt anyone. Defendant responded, "Fuck her. I hope she dies. That's why I deserve to die." Defendant said he had four glasses of wine and several prescription pills belonging to his fiancé.

Firefighter Doug Smith testified that while he worked on getting defendant out of the car, defendant was hostile and angry. Defendant repeated several times, "The bitch deserved it," and "The bitch deserved to die." Defendant was placed in the back of a patrol car, where Smith assessed his physical condition while defendant cursed at him and everyone else. Defendant said, "You deserve to die." "We all deserve to die." "She deserved to die." While defendant was being loaded into an ambulance, the information that Emily had died was broadcast over the radio. Defendant repeated various versions of, "The bitch deserved to die." Smith did not think defendant was mentally ill, but thought he was either suicidal or homicidal.

EMT Joshua Smith was with defendant in the back of the ambulance that transported defendant to the hospital. In response to Smith's efforts to get basic identifying information, defendant said, "I'm not going to give you any information. I don't know how you're going to get me for this." Defendant said he was trying to kill himself by driving off a cliff. The closest cliff to the crash site was about two miles away.

Deputy Sheriff Daniel Laubschar, a mechanical expert, examined defendant's car for defects or other problems that might have been a factor in the collision. He determined that there were none. Mitsubishi also tested the car and found no mechanical defects that would have caused the collision.

### 2. Events Prior To The Collision

Defendant and Mardi Martinez were coworkers at a veterinary clinic. They became romantically involved in November 2009. By April 2010, they were living together. Defendant was terminated on April 1, because his behavior had become erratic. Defendant arranged to pick up his final check the morning of April 3. Martinez did not

4

feel well when she woke up that morning. She took her depression medications (Klonipin and Ativan). When defendant came home from picking up his check and running errands he wanted to discuss plans for later that day, but Martinez just wanted to sleep. While Martinez was in bed, defendant worked on the computer; he said he was transferring funds. Defendant gave Martinez a check for $5,700; on the memo line he wrote, "Enjoy your life." Martinez told defendant she did not want the check. She tried to persuade defendant to come back to bed with her, but defendant said he was "going to go out and get something better for us." Martinez thought defendant was going out to look for a job. When Martinez later tried calling defendant on his cell phone, she discovered he had left it on the dresser in the bedroom. Also on the dresser, next to the check, Martinez found the following note defendant had written:

> "Credit Card, American Express approximately 3K. Have 8K available. Credit Card, Visa Credit and Debit $5415. [Social Security Number.] Deposit check in your account now, no later than 4/4/2010. Please tell my parents I'm gone, will never return, no need to look, will no longer return. Dad, Mom, please take care of Mardi. She needs it greatly. I love you and hope all is well. Thank you for loving me and Mardi. And I love you. Please take care of Mardi. She needs it. Love, Sina.
>
> "P.S. Mardi might be pregnant. As she says, I love her so much. I can't survive doing everything, so I give up. Mom, make sure Mardi is loved and taken care of as well as I was. She needs it. I love her, and I will always – and I will miss her dearly. I will miss you all, too. Love you Mom and Dad. Sorry for this note. Will see you in heaven one day. Bye now. Love Sina."

Along with the note, defendant had left his watch, wallet and keys, as well as his removable tooth implant. When defendant's father called on defendant's cell phone, Martinez told him about the note. Defendant's parents came over and one of them called the police.

5

*B.*     *The Defense Case*

When Deputy Sheriff David Huelsen, an accident investigator, arrived at the crash site, defendant's car was still there. Based on the marks on the road, Huelsen concluded that defendant "made a sudden hard veer to the right which caused the vehicle to go into a yaw and leave the roadway and ultimately strike the pole and eventually come to its point of rest on the side of the road." In Huelsen's opinion, defendant deliberately drove in the direction of the pole. Huelsen estimated that defendant was driving 70 miles per hour when he made the turn. There were no skid marks, which indicated that defendant had not braked.

Accident investigator and reconstructionist Kenneth Solomon reviewed photographs, police reports, witness statements and prior testimony related to the collision, as well as reports of other accidents occurring on the same stretch of PCH. In Solomon's opinion, defendant lost control of his car when the yaw began. The yaw was caused by more than a simple lane change: "It may have been more of an exaggerated lane change along with a condition of the roadway achieving the co-efficient of friction threshold and then beginning a yaw. [¶] Once you're in a yaw, you have no control . . . ." The triggering event was turning the wheel too much, but for the next 130 feet, defendant had no control of the car. In Solomon's opinion, there was no scientific evidence that defendant intentionally drove into the pole.

Psychologist Mary Large was asked to evaluate defendant to determine whether he had any mental condition that might have contributed to his behavior relating to the crash. Defendant had been previously diagnosed with a constellation of conditions, including Autism, Tourette's and Obsessive Compulsive Disorder. All of these conditions are characterized by an inability to regulate one's own behavior.

**DICUSSION**

A.    *Instruction on Express Malice Was Not Error*[2]

Defendant contends it was error to give CALCRIM No. 520 without deleting the references to express malice.  He argues that the jury could have incorrectly understood the instruction to mean that a failed suicide attempt can support a finding of express malice.  We first discuss briefly the difference between express malice and implied malice.  We then consider whether there was sufficient evidence of express malice to warrant the instruction.  Finally we conclude that even if there was inadequate evidence of express malice, there was no reversible error by including the instruction.

Murder is the unlawful killing of a human being with malice aforethought.  (§ 187, subd. (a).)[3]  Malice "is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature.  It is implied . . . when the circumstances attending the killing show an abandoned and malignant heart."  (§ 188.)  Express malice requires a showing that the assailant either desired the death to occur, or knows to a substantial certainty that death will be the result of his actions.  (*People v. Smith* (2005) 37 Cal.4th 733, 740.)  For example, it is well established that the act of firing a weapon at close range is sufficient to demonstrate intent to kill with express malice.  (*People v. Jackson* (1989) 49 Cal.3d 1170, 1201 (*Jackson*); *People v. Lashley* (1991) 1 Cal.App.4th 938, 945.)  *People v. Moore* (2010) 187 Cal.App.4th 937, provides a good example of implied malice.  There, the defendant's conduct in driving 70 miles an hour in a 30-mile-per-hour zone, crossing into the opposing traffic lane, causing oncoming drivers to avoid the defendant, running a red light and striking a car in an intersection without breaking was found sufficient to demonstrate implied malice.  The jury is not required to agree on

---

[2]    The People argue defendant forfeited his claim of error by not requesting any modification of CALCRIM No. 520 to meet the facts of this case.  We conclude that defendant's objection to *any* instruction on express malice was sufficient to preserve the issue.

[3]    All undesignated statutory references are to the Penal Code.

whether a murder conviction is supported by evidence of express or implied malice. (*People v. Brown* (1995) 35 Cal.App.4th 708, 713-714.)

Trial courts must instruct sua sponte on relevant principles of law. (*Jackson, supra,* 49 Cal.3d at p. 1199.) Thus, if there is evidence from which a jury could infer that the defendant intended to kill the victim, the trial court must instruct on express malice. CALCRIM No. 520 correctly defines express and implied malice. (See *People v. Stanley* (1995) 10 Cal.4th 764, 796-797 [approving first two sentences of CALJIC No. 8.11]; *People v. Dellinger* (1989) 49 Cal.3d 1212, 1221-1222 [approving remainder of CALJIC No. 8.11].)

Here, defendant objected to the People's request that the jury be instructed on express malice, arguing that the People's theory had always been implied malice murder. The trial court concluded that, even though the People's theory was implied malice, there was evidence of express malice by which the jury could reasonably infer that defendant intended to kill Emily and therefore express malice instructions were warranted. The trial court also apparently concluded that it was important to include both express and implied malice instructions because questions asked by the jury during deliberations at defendant's first trial revealed that the jurors may have been confused about implied malice.

As given, CALCRIM No. 520 reads:

> "The defendant is charged in Count 1 with murder in violation of Penal Code section 187. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] The defendant committed an act that caused the death of another person; [¶] AND [¶] When the defendant acted, he had a state of mind called malice aforethought. [¶] There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. [¶] *The defendant acted with express malice if he unlawfully intended to kill.* [¶] *The defendant acted with implied malice if:* [¶] *1. He intentionally committed an act;* [¶] *2. The natural and probable consequences of the act were dangerous to human life;* [¶] *3. At the time he acted, he knew his act was dangerous to human life;* [¶] *AND* [¶] *4. He deliberately acted with conscious disregard for human life.* [¶] Malice aforethought does not require hatred or ill will toward the victim. It is a mental

8

state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time. [¶] An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. [¶] If you find the defendant guilty of murder, it is murder of the second degree." (Italics added.)

We agree with the trial court that the evidence supported instruction on express malice. Specifically, from the evidence that Engh saw Emily walking along the embankment on the side of PCH, it is reasonable to infer that defendant also saw Emily walking there. From the evidence that defendant was traveling at about 70 miles per hour when he made a deliberate sharp right turn causing his car to drive up the embankment where Emily was walking, it is reasonable to infer that defendant intended to hit Emily as he proceeded towards the pole. Defendant's statements at the scene, which included, "The bitch deserved to die," "The bitch deserved it," and "She deserved to die," all tend to show defendant intended to run Emily over with his car, knowing to a substantial certainty that the force would cause her death. On this record, there was no error in instructing on express malice. That defendant may have also intended to kill himself is beside the point. Defendant argues that express malice cannot be based on a failed suicide attempt that results in the death of another. Rather the malice must be directed to some else. Defendant's remarks at the scene and the evidence of his driving reasonably would support a jury's finding of express malice whether or not defendant intended to kill himself.

Defendant's reliance on *In re Joseph G.* (1983) 34 Cal.3d 429, for a contrary result is misplaced. In that case, a minor drove a car off a cliff in a "genuine suicide pact" with the car's other occupant; the minor survived but his companion died. (*Id*. at p. 439.) Our Supreme Court held that the minor was guilty at most of aiding and abetting a suicide,

9

not first degree murder. *Joseph G.* is inapposite to this case because here there was no suicide pact.

At oral argument, counsel for defendant asserted that whether there was substantial evidence of express malice was not properly before us because it was not raised in the briefs. (Gov. Code, § 68081 [parties must be afford an opportunity to brief an issue not otherwise brief if appellate court renders decision on the issue].) The short answer to that contention is that if defendant did not assert as error on appeal the insufficiency of the evidence of express malice, then it is defendant who has waived the point. (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 849 [failure to object that instruction which was correct in law was "inaccurate in the facts presented," constitutes forfeiture of the issue].)

More fundamentally, defendant's principal argument on appeal is that it was error to instruct on express malice. An instruction on an element of an offense must be given if there is substantial evidence to support the instruction. (*People v. Ghebretensae* (2013) 22 Cal.App.4th 741, 759.) Thus whether there was substantial evidence of express malice was at the heart of defendant's argument even if not expressly made. The trial court correctly recognized that even though the prosecutor was pursuing an implied malice theory that did not mean an express malice instruction was unwarranted. As the trial court stated, "If there are jurors who believe that he intended to kill the victim in this case, they can find him guilty using an express malice theory. I don't think it's fair to take that option away."

The jury could have reasonably found express malice based on the instructions and the evidence we have described above. The trial court could also have reasonably concluded that instructions on express malice would be helpful to the jury's understanding of implied malice. We find no error in the instruction on express malice.

Even if we were to assume error in instructing on express malice, such error was harmless. Defendant has not shown that it is reasonably probable he would have obtained a more favorable result if the express malice language had been deleted from CALCRIM No. 520. (*People v. Beltran* (2013) 56 Cal.4th 935, 955 [applying *Watson*

10

harmless error standard to a jury instruction challenge that does not amount to federal constitutional error].)[4]  As we discuss in *Part B* below, the jury was properly instructed on implied malice.  Moreover, the prosecutor argued exclusively that this was an implied malice case, and the evidence of implied malice was overwhelming.  Indeed it is difficult to fathom a stronger implied malice case.  The fact that the prosecutor asked for express malice instructions but only argued implied malice to the jury does not mean that the express malice instructions were not helpful to the jury in understanding the argument the prosecutor was making and the one she was not making.  Finally, there is no indication the jury was confused by these instructions.  No questions were asked relevant to the malice instruction and jurors were told to ignore instructions that did not apply.

B.      *The Implied Malice Instruction Was Sufficient*

CALCRIM No. 520 states that the defendant acts with implied malice if he intentionally commits an act and "the natural and probable consequences of the act were dangerous to human life."  Defendant requested that the instruction be modified to state: "The natural and probable consequences of the act were dangerous to human life – *or dangerous to another*."  He argued that the form instruction was confusing because it might lead the jury to mistakenly believe that an act that was dangerous only to defendant himself would be evidence of implied malice.  The trial court refused the request.  On appeal, defendant contends this was error.  We disagree.

When evaluating jury instructions for error, they must be read as a whole to determine whether there is a reasonable likelihood that the jury misunderstood the instruction in a manner that violated the defendant's rights.  (*People v. Smith* (2008) 168 Cal.App.4th 7, 13.)

"[S]econd degree murder with implied malice has been committed 'when a person does an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person *who knows that his conduct endangers the life of*

---

[4]      *People v. Watson* (1956) 46 Cal.2d 818.

11

*another* and who acts with conscious disregard for life. . . . [Citations.] Phrased in a different way, malice may be implied when defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life.' " (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102-103, italics added.) "The concept of implied malice has both a physical and a mental component. [Citation.] The physical component is satisfied by the performance of ' "an act, the natural consequences of which are dangerous to life." ' [Citations.] The mental component . . . involves an act ' "deliberately performed by a person who knows that his conduct *endangers the life of another* and who acts with conscious disregard for life." ' " (*Id*. at pp. 106-107, italics added.) "Implied malice, like all other elements of a crime, may be proven by circumstantial evidence. [Citation.]" (*People v. Klvana* (1992) 11 Cal.App.4th 1679, 1704.)

In *People v. Taylor* (2004) 32 Cal.4th 863, 868, our Supreme Court held: " 'It is plain that implied malice aforethought does not exist in the perpetrator only in relation to an intended victim. Recklessness need not be cognizant of the identity of a victim or even of his existence.' [Citations.] When a defendant commits an act, the natural consequences of which are dangerous to human life, with a conscious disregard for life in general, he acts with implied malice towards those he ends up killing. There is no requirement the defendant specifically know of the existence of each victim." In *Moore, supra,* 187 Cal.App.4th at page 941, for example, evidence that the defendant was driving 70 miles per hour in a 35–mile–per–hour zone, crossed into the opposing traffic lane causing oncoming drivers to take evasive action, ran a red light and struck a car without even attempting to apply his brakes supported a finding of implied malice murder.

As previously noted, CALCRIM No. 520 correctly states the law with respect to malice. As given, it clearly encompasses the requirement that defendant knew his conduct endangered the life of another. The instruction requires the People to prove that the "defendant committed an act that caused the death of another person." It goes on to define implied malice as an intentional act "the natural and probable consequences of the act were dangerous to human life." The instruction also points out that malice

12

aforethought "does not require hatred or ill will toward the victim." Read as a whole, no reasonable juror would understand the instruction to mean that commission of an act dangerous only to the defendant would qualify as "malice aforethought."

*C.*     *Sentencing*

Defendant contends that the imposition of a concurrent one year term on the section 12022, subdivision (b)(1) enhancement was an unauthorized sentence. He argues that the enhancement must either be imposed consecutively or stricken. We agree.

"A person who personally uses a deadly or dangerous weapon in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for one year, unless use of a deadly or dangerous weapon is an element of that offense." (§ 12022, subd. (b)(1).) Ordinarily, a sentence enhancement must be imposed or stricken "in the furtherance of justice" under section 1385. (*People v. Lopez* (2004) 119 Cal.App.4th 355.) Because subdivision (b)(1) of section 12022 specifies that the enhancement be consecutive, the trial court had discretion only to impose it consecutively, or strike it. The People cite no authority, and our independent research has found none, that stands for the proposition that the rule applies only to determinate sentences and not to an indeterminate life term. The error cannot be considered harmless and the case must be remanded for proper sentencing on the enhancement only. (*People v. Bonnetta* (2009) 46 Cal.4th 143, 151-153.)

**DISPOSITION**

The judgment is reversed solely with respect to the sentence, and the matter is remanded for resentencing with directions that the trial court either impose a concurrent one year term for the section 12022, subdivision (b)(1) enhancement, or strike the enhancement pursuant to section 1385, setting forth its reasons on the record. Upon resentencing, the trial court is directed to prepare a corrected abstract of judgment and

13

forward a copy to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


                                        RUBIN, J.
WE CONCUR:


        BIGELOW, P. J.


        FLIER, J.