Filed 2/26/21  P. v. Frazier CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C090279 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE019812) |
| v. | |
| CARL WILLIAM FRAZIER, | |
| Defendant and Appellant. | |

Karl Curtis, a passenger in a car driven by defendant Carl William Frazier, attacked defendant when defendant said he would not continue to drive Curtis around in search of crack cocaine.  After the car crashed into some bushes, both men exited the vehicle, defendant from the driver's seat and Curtis from the front passenger seat.  A third person who was in the car testified that as Curtis walked away from the crash, defendant pursued and then fatally stabbed him.  Defendant testified that Curtis was moving towards him and that he feared for his life.  A jury found defendant guilty of first degree murder, and the trial court sentenced him to 81 years to life in prison.  On appeal,

1

defendant argues (1) there was insufficient evidence of premeditation and deliberation for first degree murder and (2) the trial court committed reversible error by failing to instruct the jury sua sponte on involuntary manslaughter. We will affirm.

BACKGROUND

Around 3:00 o'clock one morning in October 2017, Curtis and his girlfriend, Angela Castro, called defendant and asked him for a ride in exchange for gas money. Defendant and Curtis knew each other through a mutual acquaintance but were not friends.

Defendant picked up Curtis and Castro in his car about five minutes later. Curtis gave defendant money for gas and the group went to several destinations as Curtis sought crack cocaine. Eventually, all three individuals smoked crack cocaine inside the car.

At some point while defendant was driving, defendant and Curtis began to argue about the terms of their driving arrangement. Defendant demanded Curtis and Castro exit the car so that he could go home, but Curtis refused to leave and demanded defendant continue to drive him around. Curtis said to defendant, with an angry tone, "Bitch, you are going to take me where I want to go." Defendant threw Curtis's money back at him, saying, "I don't want your money, you can have your money back."

Curtis "jump[ed] on top of" defendant, who had his seatbelt fastened and was still driving. Curtis put defendant in a choke hold and knocked defendant's glasses off his face.

*People's case*

Castro testified that as the two men "started tussling" and trying to punch each other, she did not hear any threats uttered. She did hear Curtis say to defendant, "Take it easy, I'm going to get off."

Moments later, the car collided into some bushes in a residential area.

Curtis "jumped out" of the car and Castro followed. Curtis walked "around the back of the vehicle" while defendant (not wearing his glasses) made his way to the

2

driver's side rear bumper of the car and then "r[an] back to the car," "grabbed something under the front seat," and approached Curtis while holding a knife.

Curtis, who never approached the driver's side of the car and made no physical movement toward defendant, was facing the car as he walked backwards away from the vehicle (and from defendant) with his hands above his shoulders holding the sleeves of a jacket. Now across the street from the crash scene, defendant lunged towards Curtis and swung his knife at Curtis, who continued backing up while laughing and telling defendant to "chill out."

Defendant swung his knife at Curtis three times. Curtis "stumbled backwards," "looked down," and said, "Dude, dude, did you just stab me?" He fell to the ground and "started bleeding out."

Castro started screaming and yelled, "[C]all 911." Defendant "r[an] over with his phone and asked [her] to dial 911 for him." Castro dialed the number and gave the phone back to defendant.

Castro's screaming woke a nearby resident, who went outside and saw a lot of blood, Castro kneeling at Curtis's side holding a T-shirt to Castro's ribs, and defendant standing by Curtis's feet.

The resident asked, "[D]id you call 911?" Defendant, who appeared "in a state of shock" to the resident, "kind of stumbled a bit and turned around and headed for the car." Castro screamed at the resident to "get the license plate," as defendant got into his car and drove away from the scene.

An autopsy revealed that Curtis died from a stab wound to the chest. The wound was over four inches deep, piercing Curtis's heart.

*Defendant's case*

Defendant testified that when Curtis attacked him in the car, it felt like he was being "tackled." "[M]ost of [Curtis's] body was on top of" defendant, and Curtis's "left hand was wrapped around" defendant's head, and covering defendant's nose and mouth,

3

"suffocating" him. With his right hand, Curtis was "pounding . . . the top of" defendant's head. Defendant was "[e]xtremely frightened," thinking Curtis was "trying to kill" him.

Defendant unbuckled his seatbelt and "hit" the driver's "door and . . . tumble[d] out of the car" just as the car crashed into the bushes.

After the crash, defendant, who without his bifocals saw nearby objects "very blurry" and "[f]urther away" objects "a little clearer, but . . . still blurry," was searching for his glasses in the interior of the car when he heard the passenger door open. Defendant saw Curtis exit the front passenger seat, and "looked over the roof" of the car to see Curtis "coming around the back" and threatening to "beat [defendant's] ass."

Defendant took that statement as a threat, as Curtis "had just tried to kill" defendant.

Defendant yelled at Castro to get out of the car, and then defendant (still without his glasses) felt his way along the side of the car to the driver's side taillight, and saw Curtis "coming at [him]." It was "very dark" outside and "everything [was] blurry." Defendant, his back "wrenched out from falling out of the car and having [Curtis] on top of [him] and pounding on" him, pulled a knife out of his pocket, "bent down under" Curtis's outstretched arms, "swung and . . . said, 'Back off.' " Defendant "felt [his] hand hit" Curtis, and saw Curtis take three steps backwards and say, "What did you do, stab me motherfucker?"

Defendant testified that he was "[f]rightened" and "[t]errified" when he swung the knife. But "[a]ll [he] wanted to do [was] create space between" himself and Curtis, and "get [Curtis] to stop and back off."

Defendant "followed" Curtis (who was "backing up across the street") to try to prevent Curtis from "fall[ing] flat on his face." Curtis fell down on his rear end and then fell onto his back. Defendant bent over Curtis and was calling out his name when Castro "start[ed] screaming, [C]all 911, call 911," just as defendant was reaching into his pocket to pull out his phone.

4

Defendant held his phone up to Castro, saying, "I can't see the phone." Castro entered 911, and then defendant "sen[t] the call," able to distinguish the green ("send") and red ("end") icons on the phone, but not "any numbers or anything." Defendant confirmed that the voice on the recording of a 911 call played to the jury earlier in the trial was his.

After the 911 call, defendant walked over to Castro and told her to "[k]eep pressure" on the stab wound. Castro replied, "Fuck you." Defendant got in his car and drove home to tell his elderly mother, who he cared for, "what was going on," "before [law enforcement] just took [him] to jail."

On cross-examination, defendant said he was "angry" when Curtis refused to get out of the car, and he never saw Curtis with a weapon.

*People's rebuttal evidence*

A detective who spoke to defendant about seven hours after the stabbing testified that she had photographs taken of defendant's head and face, and that, consistent with those photos, which were given to the jury, she observed no bruises on defendant's head or face at the time. The only potential bruising that defendant referenced when the detective spoke with him was the possibility of "marks" on his right cheek.

Defendant did not tell the detective that he fell out of the moving car onto his arm or shoulder; if he had, photos would have been taken of those body parts.

*Jury instructions*

The trial court instructed the jury on first and second degree murder, lawful self-defense, "heat of passion" voluntary manslaughter, and imperfect self-defense voluntary manslaughter.

*Closing arguments*

The prosecutor argued the case was "about bringing a knife to a fistfight" that the victim started, but that "ended when . . . the [v]ictim [was] walking away from the car." So when defendant "retriev[ed] a knife after seeing where the [v]ictim was . . . and

5

stabb[ed] him after this argument," "[i]t's not really a self-defense case. It is a murder." "[W]hen that car crashes and . . . Curtis is walking backward away, there is no imminent threat. There's no need for self-defense."

The prosecutor also argued that defendant was being "less than honest" when he claimed Curtis "beat the shit out of" him inside the car, as the photos taken approximately seven hours afterward showed "no bruising . . . no injuries."

Defense counsel argued that the confluence of "[t]he surprise attack," the car crash, "[b]lurry images," "[a] pounding heart," and "[m]ere seconds" to react led defendant to commit "[a]n act of self-defense." When Curtis "comes back around the car," defendant had "no time . . . to do anything other than defend himself" against "this man" who is "coming at him" and threatening to "whoop [defendant's] ass." "[T]his is not first degree murder. This is not second degree murder. And this is not any type of manslaughter. [¶] There was not enough time. . . . There was only time to act in lawful self-defense."

*Verdict and Sentencing*

On July 19, 2019, the jury found defendant guilty of first degree murder. The jury also found true the allegation that defendant personally used a deadly weapon (the knife) in the commission of the murder in violation of Penal Code section 12022, subdivision (b)(1).[1]

In a bifurcated proceeding, the jury found true allegations that defendant had four prior serious felony and prior strike convictions (§§ 667, subds. (a), (e)(2), 1170.12, subd. (c)(2)), and served six prior prison terms (§ 667.5, subd. (b)).

On August 16, 2019, the trial court declined to exercise its section 1385 discretion to strike any prior strike, but did strike three of the four serious felony priors, and all six

---

[1]     Undesignated statutory references are to the Penal Code.

of the prison term priors.  It then sentenced defendant to 75 years to life for the murder (25 years to life, tripled because of the strike priors), consecutive to a six-year term (five years for one serious felony prior and a consecutive one-year term for the deadly weapon enhancement).

Defendant timely appealed.

DISCUSSION

I

Defendant argues there was insufficient evidence of premeditation and deliberation for first degree murder.  Specifically, defendant argues there was no evidence of a plan to kill, of a motive to kill, nor that the manner of the killing reflected an intent to kill according to a preconceived design.

The People argue that substantial evidence supports the conviction for first degree murder.  We agree.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]' (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)" (*People v. Battle* (2011) 198 Cal.App.4th 50, 61-62.)

The parties agree that the framework of *People v. Anderson* (1968) 70 Cal.2d 15 is helpful in assessing the sufficiency of the evidence of premeditation and deliberation.

"*Anderson* identified three factors commonly present in cases of premeditated murder:  '(1) [F]acts about how and what defendant did prior to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as "planning" activity; (2) facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim, which inference of

7

motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of "a pre-existing reflection" and "careful thought and weighing of considerations" rather than "mere unconsidered or rash impulse hastily executed" [citation]; (3) facts about the nature of the killing from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" which the jury can reasonably infer from facts of type (1) or (2).' [Citation.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1081, italics omitted.)

" 'When evidence of all three categories is not present, "we require either very strong evidence of planning, or some evidence of motive in conjunction with planning or a deliberate manner of killing." [Citation.] But these categories of evidence . . . "are descriptive, not normative." [Citation.] They are simply an "aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations . . . ." [Citation.]' [Citation.]" (*People v. Elliot* (2005) 37 Cal.4th 453, 470-471 (*Elliot*).)

"A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. (§ 189 ['willful, deliberate and premeditated killing' as first degree murder].) 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." [Citations.]' [Citation.]" (*People v. Koontz, supra*, 27 Cal.4th at p. 1080.)

Here, in the light most favorable to the People, the record reflects that after the altercation inside the car ended, and Curtis and defendant were physically separated (by the car, whose front end had crashed into bushes), defendant then purposefully armed

8

himself with a knife before pursuing a backpedaling Curtis across the street and fatally stabbing him. That is sufficient evidence to support willful, deliberate, and premeditated murder.

Regarding planning, Castro's testimony indicated that after Curtis and defendant both exited the car, Curtis was walking away from the car and defendant was near the driver's side rear bumper of the car when defendant "r[an] back," "grabbed something under the front seat," and then approached Curtis with a knife. The jury could have construed this evidence as establishing that defendant planned a deadly encounter outside the car. (See *Elliot, supra*, 37 Cal.4th at p. 471 [evidence that "defendant armed himself with a knife prior to the attack 'supports the inference that he planned a violent encounter' " for purposes of the "planning" *Anderson* factor]; *People v. Thomas* (1992) 2 Cal.4th 489, 517 ["Circumstantial evidence suggestive of planning activity" where the jury "could infer that defendant returned to his car to get the [weapon] before committing the murder[ ]"].)

Regarding motive, the jury could have construed the evidence as establishing defendant deliberately intended to kill Curtis due to his anger with Curtis (1) for not getting out of the car when defendant asked him to, and (2) for attacking defendant inside his own car. (See *People v. Jackson* (1989) 49 Cal.3d 1170, 1200 [affirming first degree murder conviction where "defendant became angry when approached by [a policeman] and when asked his name," as " 'the law does not require that a first degree murderer have a "rational" motive for killing. Anger at the way the victim talked to him . . . may be sufficient' "].)

Regarding the manner of killing, even assuming for the sake of argument that defendant is correct that the particulars of the single knife wound to Curtis's chest did not reflect a manner of killing consistent with first degree murder, the evidence of planning and motive are sufficient for affirmance of the verdict. (See *Elliot, supra*, 37 Cal.4th at p. 470; *People v. Hernandez* (1988) 47 Cal.3d 315, 349, 350 [affirming first degree murder

9

verdict though "evidence of premeditation and deliberation was not great" and evidence of planning was "slim"].)  This is so because even when evidence may support a contrary finding, it is not our role to reweigh the evidence where the circumstances reasonably justify the trier of fact's findings.  (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)

II

Although defendant's trial counsel did not ask for a jury instruction on involuntary manslaughter, defendant argues that the trial court committed reversible error by failing to give such an instruction sua sponte.  Specifically, defendant contends there was substantial evidence that defendant lacked "both the express malice (specific intent to kill) and the implied malice (conscious disregard for life) required for either murder or voluntary manslaughter," triggering the trial court's duty to provide an involuntary manslaughter instruction even if trial counsel did not request it and the instruction conflicted with a defense theory.

The People argue there was insufficient evidence to trigger the sua sponte instruction.  They contend that *even if* there was substantial evidence defendant did not intend to kill, that lack of intent "would not negate implied malice."

Both parties rely on *People v. Brothers* (2015) 236 Cal.App.4th 24 (*Brothers*) for support.

We conclude the trial court did not err.

When there is substantial evidence showing a defendant committed a lesser included offense, the trial court has a duty to instruct the jury on it.  (*People v. Cook* (2006) 39 Cal.4th 566, 596 (*Cook*).)  "The court must, on its own initiative, instruct the jury on lesser included offenses when there is substantial evidence raising a question as to whether all the elements of a charged offense are present [citations], and when there is substantial evidence that the defendant committed the lesser included offense, which, if accepted by the trier of fact, would exculpate the defendant from guilt of the greater offense."  (*Ibid*.)  We review de novo the trial court's failure to instruct on a lesser

included offense, considering the evidence in the light most favorable to the defendant. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) "Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder. [Citations.]" (*People v. Knoller* (2007) 41 Cal.4th 139, 151.) "[M]alice may be express or implied. [¶] . . . [It] is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature." (§ 188, subd. (a).) It is "implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' [Citation.] In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less." (*Knoller, supra*, at p. 143.) Implied malice has " 'both a physical and a mental component. The physical component is satisfied by the performance of "an act, the natural consequences of which are dangerous to life." [Citation.] The mental component is the requirement that the defendant "knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life." ' " (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.)

Voluntary manslaughter and involuntary manslaughter are both lesser included offenses of murder. (*People v. Thomas* (2012) 53 Cal.4th 771, 813.) "The lesser included offense of manslaughter does not include the element of malice, which distinguishes it from the greater offense of murder. [Citation.]" (*Cook, supra*, 39 Cal.4th at p. 596.)

"When a homicide, committed with malice, is accomplished in the heat of passion or under the good faith but unreasonable belief that deadly force is required to defend oneself from imminent harm, the malice element is 'negated' or . . . 'mitigated'; and the

11

resulting crime is voluntary manslaughter, a lesser included offense of murder. [Citations.]" (*Brothers, supra*, 236 Cal.App.4th at p. 30.)

In contrast to murder and voluntary manslaughter, involuntary manslaughter is an unlawful killing of a human being without malice or mitigated malice. (§ 192, subd. (b).) "One commits involuntary manslaughter either by committing 'an unlawful act, not amounting to [a] felony' or by committing 'a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.' (§ 192, subd. (b).)" (*Cook, supra*, 39 Cal.4th at p. 596.)

Involuntary manslaughter also may be based on an unlawful killing in the course of an inherently dangerous assaultive felony without malice (i.e., without the intent to kill or without conscious disregard for life). (*Brothers, supra*, 236 Cal.App.4th at pp. 33-34; see *People v. Bryant* (2013) 56 Cal.4th 959, 970 ["voluntary manslaughter requires either an intent to kill or a conscious disregard for life"].)

" '[T]he existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury. [Citations.] "Substantial evidence" in this context is " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]' " that the lesser offense, but not the greater, was committed.' " (*People v. Moye* (2009) 47 Cal.4th 537, 553.)

We find no error in the trial court's noninstruction on involuntary manslaughter. Even viewing the evidence in the light most favorable to defendant, there was insufficient evidence for the instruction because a reasonable juror could not have entertained a reasonable doubt that defendant acted in conscious disregard of the risk his conduct posed to Curtis's life. (See *Brothers, supra*, 236 Cal.App.4th at p. 34 [no substantial evidence of absence of malice warranting an involuntary manslaughter instruction, because even crediting defendant's testimony that she did not intend to kill the victim,

12

there was not "evidence from which a reasonable juror could entertain a reasonable doubt that [defendant] had acted in conscious disregard of the risk her conduct posed to [the victim's] life"].)

The evidence presented at trial showed that defendant engaged in inherently dangerous assaultive felony conduct (*Brothers*, *supra*, 236 Cal.App.4th at pp. 34-35), namely, as Curtis was retreating, defendant armed himself with a knife, lunged at Curtis and swung the knife in a slashing motion across his upper torso three times. The fact that defendant targeted the victim's chest and heart—a crucially vital organ—increased the likelihood of death and excluded the possibility that he merely was attempting to "get him to stop and back off." Ultimately, defendant's knife penetrated four inches into Curtis's chest, piercing his heart. Such a forceful attack to a particularly vulnerable area of Curtis's body showed that defendant "deliberately engaged in a type of aggravated assault the natural consequences of which are dangerous to human life, thus satisfying the objective component of implied malice as a matter of law . . . ." (*Brothers*, at p. 35.)

And though defendant contends a reasonable jury could have concluded that his conduct lacked malice, defendant points to nothing in the trial record indicating he lacked a subjective awareness of the danger his conduct posed to human life. Accordingly, the trial court did not err. (*Brothers, supra*, 236 Cal.App.4th at p. 35 ["when . . . the defendant indisputably has deliberately engaged in a type of aggravated assault the natural consequences of which are dangerous to human life, thus satisfying the objective component of implied malice as a matter of law, *and no material issue is presented as to whether the defendant subjectively appreciated* the danger to human life his or her conduct posed, there is no sua sponte duty to instruct on involuntary manslaughter," italics added].)

We are not persuaded by defendant's characterization of his testimony as constituting substantial evidence that he acted without malice. Under defendant's version of events, his vision was blurry and it was dark outside. Curtis was coming at him.

13

Defendant was "[f]rightened" and "[t]errified" when he swung the knife, but "[a]ll [he] wanted to do [was] create space between" himself and Curtis and "get [Curtis] to stop and back off." Importantly, however, defendant testified that he swung the knife at Curtis *after* he "bent down under" Curtis's outstretched arms. Thus, defendant understood that Curtis was within arm's length when he violently swung his knife into Curtis's chest. This suggests that defendant acted with a conscious disregard for human life. It does not suggest that defendant lacked a subjective appreciation for the danger to human life his conduct posed.[2]

---

[2] Further, any error in failing to instruct the jury on involuntary manslaughter was harmless because "[t]he jury rejected the lesser options" of culpability, like second degree murder and voluntary manslaughter, "and found defendant guilty of first degree premeditated murder. Under the circumstances, there is no reasonable probability that, had the jury been instructed on involuntary manslaughter, it would have chosen that option." (*People v. Rogers* (2006) 39 Cal.4th 826, 884.)

## DISPOSITION

The judgment is affirmed.

       KRAUSE       , J.

We concur:

       RAYE       , P. J.

       RENNER       , J.