Filed 12/3/21  P. v. Rubin CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EDWARD J. RUBIN,<br><br>    Defendant and Appellant. | B306556<br><br>(Los Angeles County<br>Super. Ct. No. TA146161) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Julian C. Recana, Judge.  Modified and affirmed with directions.

Melissa Hill, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Edward Jamal Rubin killed his lover, inflicting blunt force trauma to her head and strangling and drowning her in a bathtub.  Her son heard her call for help; soon after, he and a neighbor found appellant locked in the bathroom with the dead or dying woman.  A jury convicted appellant of willful, deliberate, and premeditated murder.  (Pen. Code, § 187, subd. (a).)[1]

Appellant does not deny the killing but contends that there is no evidence of planning and deliberation.  After examining the entire record, we conclude that substantial evidence supports his conviction for murder in the first degree.  The court did not abuse its discretion by admitting into evidence information extracted from appellant's phone.  We affirm the judgment of conviction but vacate the order requiring appellant to pay attorney fees.

**FACTS**

Louise Graham lived in Los Angeles with her husband K.O. and sons C.O. and Ca.O., ages 10 and 13.  C.O. knew his mother had male friends who spent the night with her; it was not a secret.  Ca.O. testified that appellant spent time at the family's home and sometimes spent nights with Graham.

On May 27, 2018, K.O. went to church and Graham went shopping.  When she returned, appellant was with her; he and her sons unloaded groceries from her car.  That evening, C.O. played video games in his bedroom with a friend, Alan V., with the door ajar.  C.O.'s bedroom is near his mother's, which has its own bathroom.

C.O. heard his mother say, "Give me back my keys," and appellant say, "shut up, bitch."  C.O. was certain the two cursed each other and talked about house keys on the day she died.

_____

[1] Undesignated statutory references are to the Penal Code.

2

Another argument between them arose two months earlier, when his mother became angry because appellant was with a girl.

C.O. heard his mother say "help." Though he recognized her voice and Belizean accent, C.O. did not react because "I thought someone was saying it on the game." He continued to play his game, then felt "the ground shaking" and heard "stuff falling down."

C.O. heard water overflowing from his mother's bathtub. Seeing that her bedroom door was closed, he walked outside and saw water dripping from the second story to the yard. K.O. was not home, so C.O. sought help from David Garbutt, who lives in a back house on the property.

Garbutt saw water dripping from the house. He and C.O. tried to enter the master bedroom, but the door was locked. Once C.O. opened the lock, they found no one in the bedroom. C.O. and Garbutt tried to enter the bathroom but the door was locked.

C.O. knocked on the bathroom door. He heard nothing then knocked again. He and Garbutt tried to open the door. Appellant, who was inside the bathroom, told them several times to wait.

Appellant opened the bathroom door. C.O. recalled that appellant was wearing jeans, a sleeveless T-shirt, and Adidas shoes. Water darkened his jeans and chest and was dripping from his clothing and face.

C.O. opened the glass tub enclosure and looked into the bathtub, which was filled with water. He saw his mother laying on her back, her face under water. She was not moving. C.O. removed a towel blocking the drain opening, to release the water. He saw water outside the tub, on the bathmat and around the toilet.

3

Garbutt saw Graham curled up and unmoving in the tub. The water was over her nose. He heard C.O. say to appellant, "you killed my mom." Appellant replied that she slipped and fell in the tub. Appellant walked out of the bathroom and put some clothing in a bag in the bedroom. Garbutt did not see appellant again after that.

Alan V. heard C.O. knocking and saw appellant walk out of the bathroom after the door opened. Alan noticed that appellant's head and upper body were wet. Alan heard C.O. scream "mom, mom." Appellant ran out of the house and through the front gate, saying "shit" and "the 'F' word," according to C.O. Once appellant was outside, he made a phone call. Alan saw appellant get picked up by someone in a car; later, Alan saw appellant back at Graham's home.

Garbutt and C.O. called 911. Paramedics were dispatched at 8:22 p.m. A neighbor and Garbutt's visitors arrived to assist. The neighbor heard C.O. screaming, "Can you help my mom?" and followed the boy into the house. With instructions from the 911 operator, the adults lifted the victim from the bathtub and began CPR. Garbutt did not press on the victim's neck. Vomit came from her mouth. One of the rescuers said water was overflowing from the tub and blood dripped from Graham's nose. Witnesses at the scene testified that appellant did not help with resuscitation efforts. A detective recognized appellant's voice in the background of the 911 call, asking if Graham was breathing.

Ca.O. was in his bedroom, wearing headphones and playing video games, when C.O. opened the door and said, "Eddie killed [our] mom." C.O. was frantic and scared. C.O. left and returned with Garbutt; Ca.O. saw them open Graham's bedroom door and try to open the locked door to her bathroom. Ca.O. did not see

4

C.O. and Garbutt enter the bathroom. After Garbutt left to get help, Ca.O. walked into Graham's bathroom and saw her laying naked in the tub, with the water draining out of it. No one else was there.

Ca.O. testified that his mother took showers, not baths. Moreover, her bathtub leaked outside to the front porch if it was filled more than ankle deep.

Ca.O. saw appellant on the staircase, looking scared and saying, "oh shit. Oh, shit. Oh, shit." Ca.O. noticed that he had a damp towel over his shoulder and was carrying a black bag. He saw appellant walk out of the house.

Paramedics found Graham on the floor outside the bathroom. She was not breathing and had no pulse. They began chest compressions, used a bag mouth mask, and intubated her lungs. They observed that her airway was full of fluid. Graham did not regain a pulse or breathe while paramedics ministered to her. She was pronounced dead at the scene.

Chest compressions may cause broken ribs and bruising to the patient's rib cage. No harm is caused to the neck, which is tilted back to open the airway. It is common for a person to vomit from pressure building in the abdomen from chest compressions; vomiting may occur even if the person is already dead.

When a police detective first arrived at Graham's house, he did not see appellant. Later, appellant arrived at the house wearing a dark sport jacket. His nose and chin were scratched and he was perspiring.

A medical examiner from the coroner's office autopsied Graham. Graham's arms had fresh bruises. Her neck and head were "very congested. So they are more purple. That is something we commonly see when somebody dies of neck

5

compression or strangulation." The examiner explained that in homicidal strangulation, blood cannot leave the head, which becomes purple. A dissection showed hemorrhaging in the tissue on both sides of the neck. Graham had pinpoint hemorrhages (petechiae) on her face and eyes, consistent with forceful strangulation.

A hemorrhage on the back of Graham's head was caused by blunt trauma, i.e., "the head hitting something or something hitting the head." She was alive when she sustained the injury. Bubbles in her lungs showed pulmonary edema from drowning. Her blood contained no alcohol or drugs.

The examiner stated that the victim "died of asphyxia due to the combined effects of neck compression, drowning and blunt-body trauma." It was a homicide. Even if the toxicology report had showed drugs in the victim's system, it would not change the cause and manner of death because drugs would not cause compression hemorrhages from strangulation or blunt force trauma to the head.

Appellant had a nine-year intimate relationship with Cynthia Crawford. Crawford knew appellant referred to Graham as his "girlfriend" and had a key to Graham's house. Crawford "had words" with Graham about appellant in the past. Crawford testified that she still loves appellant.

Call logs were extracted from appellant's phone. Crawford testified that on May 27, 2018, she called appellant "a whole lot" because they were supposed to go out; when he failed to answer, she started texting. In one call, around 8:00 p.m., Crawford heard Graham's voice saying, "Come and get your man. I want him out of my house." Graham sounded angry and said, "Come get him, Cynthia. He is a fucking liar." Appellant did not answer

6

seven calls from Crawford between 7:57 p.m. and 8:18 p.m. At 8:21 p.m., appellant called 911. He telephoned Crawford multiple times starting at 8:26 p.m., four minutes after the 911 dispatch. Crawford testified that appellant asked her to pick him up near Graham's home.

Crawford told police that appellant said "something happened between him and [Graham]." At trial, Crawford denied discussing Graham's death with appellant. However, she was confronted with several recorded jailhouse calls in which she and appellant discussed the circumstances of Graham's death.[2]

_____

[2] The jury heard seven clips from calls made from jail.

In clip 1, Crawford asked appellant, "Did you put your hand on that lady?" He replied, "Nah, I ain't do nothing. Just like the regular shit man." Crawford asked, "You didn't choke her out?" Appellant said, "Just regular shit, pushed that lady off me, shit like that." Crawford said, "So you pushed her off of you and then what happened?" Appellant answered, "You know I can't talk about all that over the phone like that."

In clip 2, appellant said to Crawford, "As long as the autopsy don't say that I killed her by choking her or some shit, then everything else is irrelevant."

In clip 3, appellant said, "I took my shower, I was getting ready to go. And then you kept calling and calling. And that's what triggered her all." Crawford replied, "So what? If I call, you with me . . . You should have never went over there. I knew."

In clip 4, Crawford voiced concern that appellant told police about her when she approached the victim's home.

In clip 5, appellant called Graham his "sugar mama," to which Crawford replied, "So what are you going to do, are you going to fin[d] yourself another sugar mama that ain't gonna go nowhere?" She added, "I'm being real with you. Who you got now? Me and your family, right? Okay. What [are] you going to do? Dump me aside and fin[d] yourself another sugar mama?

Police obtained a search warrant for appellant's cell phone. Call logs and text messages were extracted from it with a program called Cellebrite. The jury saw material stored in appellant's phone on the evening of Graham's killing. An unknown woman texted him from a 424 area code number, making arrangements to pick him up. Appellant wrote that he was getting ready to leave at 6:57 p.m. The person said she was on her way and asked if appellant would be bothered if she is taller than he is. At 7:53 p.m., the person asked where to pick appellant up, to which he replies, "Hold on" at 8:02 p.m. At 8:35 p.m., the person texted appellant that she was "sitting here waiting" in her car. A few minutes later, she indicated that she was going to leave. Appellant replied, "Okay. Just a minute" at 8:42 p.m. At 9:20, she writes, "lol" and at 11:24 p.m. chastised appellant for wasting her time, adding, "Sorry we were unable to get together."

Crawford testified that she sent text messages found on appellant's phone, using a telephone number she has used for four years. On the afternoon of May 27, 2018, she texted appellant to voice dismay that he did not love her and was with

_____

And then something like this might happen." Appellant said, "Did I ever dump you to the side? . . . Are you going to dump me to the side?" Crawford answered, "No I'm not, I'm going to be here till the end. I'm going to be with you all the way to the end with this shit . . . I'm not going nowhere."

In clip 6, appellant said, "Once we find out what the fuck they talking about at this pretrial and preliminary hearing, and they get the fucking autopsy then I know how to proceed."

In clip 7, appellant said, "All I need to know is just the cause of death, man. . . . Cause then, if they try to run a twist, then I know how I got to work it then man. You know?"

8

Graham; she threatened to end their relationship. At 8:00 p.m., Crawford texted that she "heard a b\*\*\*\* in the background," prompting her to text, "leave me the f\*\*\* alone." Crawford explained at trial that it was Graham's voice she heard in the background. At 8:20 p.m. she texted appellant in anger about his other relationships. By 9:12 p.m., Crawford was near the victim's home, at appellant's request, and texted him to come and get his belongings, which were in her car. At 10:45 p.m., she texted furiously that she had been waiting for him at length and wondered if he went to the hospital "with her," which Crawford explained at trial referred to Graham.

## PROCEDURAL HISTORY

Appellant was charged with and convicted of first degree murder. (§ 187, subd. (a).) He waived his right to a jury trial on his prior "strikes." The court found true that appellant has prior serious or violent felony convictions for lewd conduct with a child and residential burglary. (§§ 288, subd. (b)(1), 459, 1170.12, subd. (b).) It sentenced appellant to prison for 50 years to life.

## DISCUSSION

### 1. Jury's First Degree Murder Finding

Appellant contends that the evidence does not support a premeditated murder finding. In a challenge to the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment, which must be upheld if there is substantial evidence from which a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. We presume the existence of every fact the trier could reasonably deduce from the evidence. (*People v. Dalton* (2019) 7 Cal.5th 166, 243–244.)

9

First degree murder is willful, deliberate, and premeditated. (§ 189, subd. (a).) "[I]t is not necessary to prove the defendant maturely and meaningfully reflected upon the gravity of [his or her] act." (§ 189, subd. (d).) The killing must be the result of thought and reflection, rather than an unconsidered or rash impulse. (*People v. Morales* (2020) 10 Cal.5th 76, 88; *People v. Pearson* (2013) 56 Cal.4th 393, 443.) "Deliberate" refers to a careful weighing of considerations in forming a course of action; "premeditated" means considered beforehand. The " ' "process of premeditation and deliberation does not require any extended period of time." ' " (*People v. Salazar* (2016) 63 Cal.4th 214, 245.) " 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " (*People v. Potts* (2019) 6 Cal.5th 1012, 1027.)

" 'Three categories of evidence are helpful to sustain a finding of premeditation and deliberation in a murder case: (1) planning activity; (2) motive; and (3) manner of killing.' [Citation]. These factors are simply a 'framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations.' " (*People v. Dalton, supra,* 7 Cal.5th at p. 248; *People v. Anderson* (1968) 70 Cal.2d 15, 26–27.)

There was evidence of motive. Appellant called Graham his "sugar mama," suggesting he was financially reliant upon her.[3] He became angry when she chastised him, called him a

_____

[3] "*Sugar mama* refers to a woman, often one who is married, who gives financial support to a typically younger lover." (Merriam-Webster Online Dict. (2021)

10

"liar" while he was on the phone with Crawford, and told him to leave her home. C.O. testified that he heard Graham demand the return of her house keys and appellant curse her in response.

" 'Anger at the way the victim talked to him may be sufficient' " to support a first degree murder conviction. (*People v. Miranda* (1987) 44 Cal.3d 57, 87, disapproved on another point in *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4.) In *Miranda*, the defendant was angered by the victims' refusal to sell beer to him. "The conversation between defendant and his victims suggests that defendant acted with conscious motive and had time to reflect upon his plan to shoot the victims. '[The] law does not require that a first degree murderer have a "rational" motive for killing.' " (*Miranda,* at p. 87; *People v. Jackson* (1989) 49 Cal.3d 1170, 1200 [evidence that defendant became angry when approached by officer demonstrated motive].)

Appellant points to a lack of planning activity, observing that he and the victim engaged in mundane activities such as unloading groceries earlier that day. But a plan may be rapidly and coldly formed (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1070), and "planning activity occurring over a short period of time is sufficient to find premeditation." (*People v. Sanchez* (1995) 12 Cal.4th 1, 34, disapproved on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Brady* (2010) 50 Cal.4th 547, 563–564 [defendant killed officer during the course of a traffic stop lasting only a few minutes; jury could find he rapidly and coldly formed the idea to kill and acted after reflection rather than on an unconsidered impulse]; *People v.*

_____

<http://merriam-webster.com/words-at-play/what-does-sugar-mama-mean> [as of Nov. 22, 2021], archived at <https://perma.cc/QA92-WC2J>.)

*San Nicolas* (2004) 34 Cal.4th 614, 658 ["brief period" between seeing the victim's reflection in the bathroom mirror and turning around to stab her was "adequate for defendant to have reached the deliberate and premeditated decision to kill" her].)

Planning could be inferred from appellant's false claim that Graham fell in the tub. His plan to make the killing look like an accident was thwarted. C.O. heard Graham cry "help" and felt "the ground shaking" and "stuff falling" during her struggle with appellant, who had scratches on his face. Appellant locked doors to the bedroom and bathroom to prevent Graham's husband or sons from coming in and disrupting his plan to kill her.[4]

In jailhouse conversations with Crawford, appellant said he felt he was safe "so long as the autopsy don't say that I killed her by choking her." Of course, the autopsy showed hemorrhages on the victim's neck, face and eyes, and her neck and head were purple, all signs of strangulation. Appellant was dripping wet when he opened the bathroom door to C.O.'s knocking. He left the bathroom and began packing his clothing, making no effort to resuscitate his lover after she "fell" and needed help. Appellant was seen by several witnesses departing the house. He changed into dry clothing then returned.

Appellant developed a cold-hearted plan to kill Graham, hoping to escape liability for the killing by claiming she died accidentally. (See *People v. Pettigrew* (2021) 62 Cal.App.5th 477, 492–493 [first degree murder conviction upheld where evidence and reasonable inferences drawn from it showed defendant argued with the victim, struck her, strangled her, left her to

_____

[4] Appellant argues that the People did not prove he locked the doors. The jury could infer that appellant did so because the victim wanted him to leave, not keep him there.

drown in a swimming pool, then removed his wet clothing before police arrived; a jury could reasonably conclude the killing was not "the result of a rash, impulsive act"].)

The manner of killing supported a finding of premeditation and deliberation. When the manner of killing is particular and exacting, it allows an inference that the defendant acted according to a preconceived design and supports a conviction for first degree murder. (*People v. Sandoval* (2015) 62 Cal.4th 394, 425.) If the manner of killing is "prolonged" it supports a finding of premeditation and deliberation. (*Ibid.*) For example, if the defendant strangles the victim instead of quickly dispatching her, it does "not suggest an unreflecting explosion of violence, but rather a preconceived design to kill the victim by the particular means chosen, and to prolong her agony in the process." (*People v. Proctor* (1992) 4 Cal.4th 499, 529–530.)

Appellant killed the victim in a particular and exacting manner. The jury could find that he wrestled with the victim to incapacitate her before killing her. She had bruises on her arms and sustained blunt force trauma, from which the jury could infer that appellant bashed her head so she would be too dazed to fight. He stuffed a towel into the tub drain, filled it with water and pushed her under water—to muffle her voice and make it appear as if she had drowned accidentally—while compressing her throat.[5] The prolonged and cruel manner of killing Graham

_____

[5] Appellant theorizes that the jury should have inferred that Graham was already taking a bath, so he did not have to fill the tub to drown her. This is an unlikely inference. Ca.O. testified that his mother took showers, not baths, and the tub leaked to the outside of the house when it was filled more than ankle deep. If Graham was bathing, and appellant merely

supports appellant's conviction.  He had time to reflect yet continued what he was doing.

Appellant's behavior while neighbors and paramedics tried to revive Graham supports the jury's finding.  He texted at 8:42 p.m., before Graham was pronounced dead by paramedics, asking a woman to wait for him in her car "just a minute" so they could party that night.  He also called Crawford to come and pick him up.  "The jury could reasonably infer . . . that defendant had in fact intended to kill the victim in cold blood, because a person who had acted under the influence of a passionate impulse would not have behaved in so cavalier a fashion so recently after committing such a violent and transgressive act." (*People v. Mills* (2010) 48 Cal.4th 158, 193–194 [after brutally killing a woman, the defendant went snowboarding and to San Francisco].)

Appellant effectively asks us to reweigh the evidence and substitute our judgment for the jury's.  "The jury *could* have reasonably found that the victim's injuries reflected an emotional, berserk attack. . . .  But it was permitted to find otherwise." (*People v. Williams* (2018) 23 Cal.App.5th 396, 410.) Though the evidence might have been reconciled with a contrary finding, this does not warrant reversal. (*People v. Vargas* (2020) 9 Cal.5th 793, 820.)

## 2.  Admissibility of Cell Phone Data

The prosecutor presented text messages through Detective Romero, who obtained information extracted from appellant's cell phone using the Cellebrite program.  Some messages were from an unknown woman, some were from Crawford, and some are appellant's replies.  Appellant objected that Romero's testimony

_____

pushed her under water, C.O. would not have felt walls shaking or heard things falling.

lacked foundation. The court overruled the objection. Appellant conceded the admissibility of "messages or words that are actually attributed to [him]," but objected to the content of texts from others. The court overruled the objection, finding that the messages are records extracted by a computer program from a phone in appellant's possession, subject to cross-examination for accuracy; they are relevant and their probative value is not outweighed by risk of prejudice to appellant or confusion on the issues.

Appellant contends that the court abused its discretion and denied him a fair trial by admitting insufficiently authenticated, inflammatory and irrelevant excerpts of text messages before and after Graham's death. A trial court's admissibility ruling cannot be disturbed " 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266 (*Goldsmith*).) We conclude that there was no abuse of discretion or unfairness.

*a. Authentication*

Writings must be authenticated. (Evid. Code, § 1401.) The court determines whether there is a sufficient showing to allow the jury to find that the writing is authentic. (Evid. Code, § 1400; *People v. Valdez* (2011) 201 Cal.App.4th 1429, 1434–1435.) For example, if the prosecution makes a sufficient prima facie showing of authenticity by demonstrating that messages came from the defendant's Facebook account, the jury reasonably could conclude that the messages were from him. (*People v. Cruz* (2020) 46 Cal.App.5th 715, 730–731.) A defendant may try to persuade jurors that the evidence is inauthentic.

Detective Romero testified that a trained expert extracted information from appellant's phone. Appellant does not dispute that it was his phone from which the material was taken; however, he argues that the technician had to authenticate the extracted material. He is mistaken. In *Goldsmith, supra,* 59 Cal.4th 258, a police investigator authenticated photographs from a traffic camera. The court wrote, "We disagree that the testimony of a [camera] technician or other witness with special expertise in the operation and maintenance of the ATES computers was required as a prerequisite for authentication of the ATES evidence." (*Id.* at pp. 271–272.) Appellant did not argue that Cellebrite gives false reports. A technician was not required to explain how the program works.

### b. Cell Phone Call Logs

Phone call logs extracted from appellant's phone using the Cellebrite program are not hearsay. The hearsay rule forbids use of an out-of-court statement for the truth of the matter asserted. (Evid. Code, § 1200.) A "statement" is a verbal expression or nonverbal conduct intended by "a person" as a substitute for verbal expression. (Evid. Code, §§ 175, 225.) Call logs automatically stored by computer are not "statements" of a "person" because " '[t]he Evidence Code does not contemplate that a machine can make a statement.' " (*Goldsmith, supra,* 59 Cal.4th at p. 274.)

The court did not abuse its discretion when it found that the cell phone logs—which recorded the telephone number corresponding to every incoming and outgoing text message or call, and the exact time of each text message or call—are admissible to show the timing of events. Appellant stopped texting and answering calls between 8:00 and 8:21 p.m. He called 911 *after* he was confronted by Garbutt and C.O., who

16

accused him of killing Graham. The jury could infer that appellant planned to escape undetected after the killing, then felt obliged to call 911 once witnesses found him in the bathroom with Graham. After calling 911, appellant called Crawford and (according to her testimony) asked her to pick him up near Graham's home. He changed into dry clothing and returned, planning to claim he stumbled on Graham after she fell and drowned. This explains why he voiced concern to Crawford (from jail) about evidence of strangulation in the autopsy report.

The call logs reflect what occurred before and after the murder. Without them, Crawford could deny calling or speaking to appellant, just as she falsely denied discussing Graham's death with appellant until she was confronted with recorded jailhouse conversations. Crawford's incessant calls, every few minutes, along with Graham's apparent discovery that appellant was making plans to meet another woman that night, sparked an argument. Angered that Graham exposed him to Crawford as a liar and upset about losing his "sugar mama," appellant locked two doors, filled the tub, and strangled and drowned Graham.

### c. *Text Messages from Crawford*

At trial, Crawford's own testimony authenticated her text messages to appellant. She admitted to authoring the texts and making the phone calls listed on the call log. (Evid. Code, § 1413 [writing may be authenticated by the person who made it]; *People v. Perez* (2017) 18 Cal.App.5th 598, 621.) Crawford explained to the jury why she sent the messages and telephoned. Her testimony was subject to cross-examination. Appellant told Crawford in a jailhouse conversation that her repeated calls to his phone "triggered" the victim.

### d. Text Messages from an Unknown Woman

The prosecutor argued at trial that text messages from an unknown woman gave context to appellant's written replies, which are admissions of a party. The court allowed them on the grounds that the messages came from a phone in appellant's possession; the process for extracting messages from the phone was properly documented; and appellant could cross-examine on the accuracy of the extracted material.

Appellant contends that the texts were unauthenticated. As noted above, the text messages from the unknown person— like those of Crawford and appellant himself—were authenticated by virtue of the mechanical process by which they were recorded and then extracted from appellant's cell phone.

Appellant argues that the messages from the unknown person are hearsay. Respondent asserts that they showed appellant's state of mind and reasons for killing Graham. We need not decide if the messages are hearsay or whether they are admissible under a hearsay exception because their admission was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

Ample evidence supported a finding of first degree murder, as discussed in part 1, *ante*. C.O. heard an argument between appellant and Graham, the sounds of a physical struggle, and his mother's cry for help. He saw water leaking downstairs from her bathroom and found appellant dripping with water in a locked bathroom with the newly drowned victim. Garbutt was there when appellant opened the bathroom door. Appellant does not contest that he killed Graham. The evidence shows motive (anger at the victim's insults), planning (his plan to make the killing look like a slip-and-fall accident), and a particular and exact method (incapacitating her with a blow to the head,

18

strangulation, and drowning). Admission of the text messages did not affect the outcome of this case.

### e. Evidence Code Section 352

Appellant contends that the prejudicial effect of the cell phone evidence substantially outweighed its probative value. He argues that it had "the potential to invoke an emotional bias against [him] due to his polyamorous lifestyle and seemingly exploitive relationships with women." The court found that "the probative value is not outweighed by any prejudice or confusing of the issues [under] 352."

The "undue prejudice" referred to in Evidence Code section 352 is "evidence that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues." (*People v. Crittenden* (1994) 9 Cal.4th 83, 134; *People v. Samuels* (2005) 36 Cal.4th 96, 124 [graphic victim photographs in murder cases are not unduly shocking or inflammatory under Evidence Code section 352].)

Evidence of appellant's busy social life may have showed him in a poor light, but that does not make it prejudicial "to the point of distracting the jury from its proper function." (*People v. Stitely* (2005) 35 Cal.4th 514, 545.) The cell phone automatically recorded appellant's activity (or silence) at the time of the murder. It is highly probative. His consensual relationships with women are unlikely to inflame a jury any more than autopsy evidence showing that the victim was held under water while being strangled. The trial court did not abuse its discretion in admitting the cell phone records.

### 3. Attorney Fees

The court ordered appellant to pay attorney fees of $10,551. Appellant argues—and respondent concedes—that the court erred by not holding a hearing to determine his ability to pay.

(Former § 987.8, subd. (b) [court may "after notice and a hearing, make a determination of the present ability of the defendant to pay all or a portion of the cost" of his representation]; former § 987.81, subd. (a) [ability to pay cost of legal assistance].)

Former section 987.8 was repealed effective July 1, 2021. (Stats. 2020, ch. 92, §§ 2, 37(j).)  We do not remand the case for a hearing because the ameliorative changes to the law regarding court-imposed costs apply to pending cases.  (*People v. Clark* (2021) 67 Cal.App.5th 248, 259–260; *People v. Greeley* (2021) 70 Cal.App.5th 609, 625–627.)  The order imposing attorney fees must be vacated.  (§ 1465.9, subd. (a).)

## DISPOSITION

The judgment of conviction is affirmed.  The order requiring appellant to pay attorney fees is vacated.  The clerk of the superior court is directed to amend the abstract of judgment to reflect this modification.

NOT TO BE PUBLISHED.


                                                    LUI, P.J.

We concur:



        CHAVEZ, J.



        HOFFSTADT, J.


20